BETHLEHEM STEEL CO. v. NILES–BEMENT–POND CO.

(Circuit Court, D. New Jersey. January 29, 1909.)

PATENTS (§ 328*)—INVENTION—PROCESS OF TREATING HIGH-SPEED TOOL STEEL.
    The Taylor and White patents Nos. 668,269 and 668,270, for a metal-cutting tool and method of making the same, which consists in forming the tool of air-hardening chrome-tungsten steel or other high-speed steel, which has been subjected to a temperature of not less than 1,725 degrees Fahrenheit, are void for lack of novelty and invention. Such patents are in effect for a process of tempering tool steel of well-known composition, and are based on the alleged discovery that when subjected to a temperature of between 1,550 and 1,725 degrees it deteriorates or breaks down, while a higher temperature greatly increases its hardness, toughness, and cutting quality; but the evidence disproves such breaking-down range, and also shows that, contrary to the statement in the patents, it was common in the prior art to subject steels of such composition designed for metal-cutting tools as well as for other purposes to temperatures exceeding 1,725 degrees, the proper temperature for each kind of steel being ascertained by experiment, as was done by the patentees.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

In Equity. On final hearing.

Thomas W. Bakewell and Francis T. Chambers, for complainant. Duell, Warfield & Duell, for defendant.

CROSS, District Judge. This is a patent case in which the issues involved are largely of fact. The record is voluminous to the point of being burdensome, and it is impossible, in an opinion of reasonable length, to set forth even in the most general way the facts upon which the decision is based. Two patents are brought to the attention of the court. Each of them is for a "metal-cutting tool and method of making same," and each was issued to Frederick W. Taylor and Maunsel White, assignors, by direct and mesne assignments to the complainant.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Application for patent No. 668,269 was filed October 20, 1899, and the patent issued February 19, 1901. Application for the second patent, No. 668,270, was filed August 10, 1900, and the patent thereon was issued February 19, 1901. The first patent contains 25 claims, of which Nos. 1, 2, 3, 4, 5, 6, 7, 8, 16, 17, 18, 19, 20, and 21 are relied upon. They are as follows:

"(1) The method of producing a metal-cutting tool adapted to retain its efficiency at high temperature, which consists in forming the tool of air-hardening tool steel containing not less than one-half of one per cent. of chromium and not less than one per cent. of one or more of the above-specified members of the chromium group, and heating it or its cutting portion up to the temperature at which the steel softens or crumbles when touched with a rod.

"(2) The described metal-cutting tool made of air-hardening tool steel containing not less than one-half of one per cent. of chromium and not less than one per cent. of another or others of the specified members of the chromium group of metals, said tool or its cutting edge being characterized as described by a considerable reduction in its contained carbid of chromium as compared with that contained in the steel from which it is made, and by its capacity to maintain its cutting edge in cutting the softer steels at temperatures at or verging on incandescence.

"(3) The method of producing a metal-cutting tool adapted to retain its efficiency at high temperatures, which consists in forming the tool of air-hardening tool steel containing not less than one-half of one per cent. of chromium and not less than one per cent. of one or more of the other specified members of the chromium group, and heating it or its cutting portion to a temperature of or over 1,725° Fahrenheit.

"(4) The method of producing a metal-cutting tool adapted to retain its efficiency at high temperatures, which consists in forming the tool of air-hardening tool steel containing not less than one-half of one per cent. of chromium and not less than one per cent. of one or more of the other specified members of the chromium group, and heating it or its cutting portion to a temperature of or over 1.850° Fahrenheit.

"(5) The method of producing a metal-cutting tool adapted to retain its efficiency at high temperatures, which consists in forming the tool of air-hardening tool steel containing not less than one-half of one per cent. of chromium and not less than one per cent. of one or more of the other specified members of the chromium group, heating it or its cutting portion to a temperature of or over 1,725° Fahrenheit and then cooling the tool rapidly to a temperature below 1,550° Fahrenheit.

"(6) The method of producing a metal-cutting tool adapted to retain its efficiency at high temperatures, which consists in forming the tool of air-hardening tool steel containing not less than one-half of one per cent. of chromium and not less than one per cent. of one or more of the other specified members of the chromium group, heating it or its cutting portion to a temperature of or over 1,850° Fahrenheit, and then cooling the tool rapidly to a temperature below 1,550° Fahrenheit.

"(7) The method of producing a metal-cutting tool adapted to retain its efficiency at high temperatures, which consists in forming the tool of air-hardening tool steel containing not less than one-half of one per cent. of chromium and not less than one per cent. of one or more of the other specified members of the chromium group, heating it or its cutting portion to a temperature of or over 1,725° Fahrenheit, then cooling the tool, and then reheating it to a temperature above 450° Fahrenheit and below 1,350° Fahrenheit.

"(8) The method of producing a metal-cutting tool adapted to retain its efficiency at high temperatures, which consists in forming the tool of air-hardening tool steel containing not less than one-half of one per cent. of chromium and not less than one per cent. of one or more of the other specified members of the chromium group, heating it or its cutting portion to a temperature of or over 1,725° Fahrenheit, then cooling the tool, and then

reheating it to a temperature above 700° Fahrenheit and below 1,240° Fahrenheit."

"(16) The method of producing a metal-cutting tool adapted to retain its efficiency at high temperatures, which consists in forming the tool of air-hardening tool steel containing not less than one per cent. of chromium and one or more of the other specified members of the chromium group in amount equal to not less than four per cent. of tungsten, and heating it or its cutting portion to a temperature of or over 1,725° Fahrenheit.

"(17) The method of producing a metal-cutting tool adapted to retain its efficiency at high temperatures, which consists in forming the tool of air-hardening tool steel containing not less than one per cent. of chromium and one or more of the other specified members of the chromium group in amount equal to not less than four per cent. of tungsten, and heating it or its cutting portion to a temperature of or over 1,850° Fahrenheit.

"(18) The method of producing a metal-cutting tool adapted to retain its efficiency at high temperatures, which consists in forming the tool of air-hardening tool steel containing not less than one per cent. of chromium and one or more of the other specified members of the chromium group in amount equal to not less than four per cent. of tungsten, heating it or its cutting portion to a temperature of or over 1,725° Fahrenheit, and then cooling the tool rapidly to a temperature below 1,550° Fahrenheit.

"(19) The method of producing a metal-cutting tool adapted to retain its efficiency at high temperatures, which consists in forming the tool of air-hardening tool steel containing not less than one per cent. of chromium and one or more of the other specified members of the chromium group in amount equal to not less than four per cent. of tungsten, heating it or its cutting portion to a temperature of or over 1,850° Fahrenheit, and then cooling the tool rapidly to a temperature below 1,550° Fahrenheit.

"(20) The method of producing a metal-cutting tool adapted to retain its efficiency at high temperatures, which consists in forming the tool of air-hardening tool steel, containing not less than one per cent. of chromium and one or more of the other specified members of the chromium group in amount equal to not less than four per cent. of tungsten, heating it or its cutting portion to a temperature of or over 1,725° Fahrenheit, then cooling the tool, and then reheating it to a temperature above 450° and below 1,350° Fahrenheit.

"(21) The method of producing a metal-cutting tool adapted to retain its efficiency at high temperatures, which consists in forming the tool of air-hardening tool steel containing not less than one per cent. of chromium and one or more of the other specified members of the chromium group in amount equal to not less than four per cent. of tungsten, heating it or its cutting portion to a temperature of or over 1,725° Fahrenheit, then cooling the tool, and then reheating it to a temperature above 700° and below 1,250° Fahrenheit."

The second patent has five claims as follows:

"(1) A metal-cutting tool formed of air-hardening tool steel containing not less than three per cent. of chromium and in addition one or more of the other specified members of the chromium group in the proportion of not less than six per cent. of tungsten or its specified equivalent, said tool or its cutting portion being characterized, as described, by a considerable reduction of its contained carbid of chromium as compared with the steel from which it is made, and by its capacity to maintain its cutting edge in cutting the softer steels at temperatures at or verging on incandescence.

"(2) The method of producing a metal-cutting tool adapted to retain its efficiency at high temperatures and in cutting very hard metal, which consists in forming the tool of air-hardening tool steel containing not less than three per cent. of chromium and one or more of the other specified members of the chromium group in amount equal to not less than six per cent. of tungsten, and heating said tool or its cutting portion to a temperature of not less than 1,725° Fahrenheit.

"(3) The method of producing a metal-cutting tool adapted to retain its efficiency at high temperatures and in cutting very hard metal, which consists in forming the tool of air-hardening tool steel containing not less than three

per cent. of chromium and one or more of the other specified members of the chromium group in amount equal to not less than six per cent. of tungsten, and heating said tool or its cutting portion to a temperature of not less than 1,850° Fahrenheit.

"(4) The method of producing a metal-cutting tool adapted to retain its efficiency at high temperatures and in cutting very hard metal, which consists in forming the tool of air-hardening tool steel containing not less than three per cent. of chromium and one or more of the other specified members of the chromium group in amount equal to not less than six per cent. of tungsten, heating said tool or its cutting portion to a temperature of not less than 1,725° Fahrenheit, and then cooling the tool rapidly to a temperature below 1,550° Fahrenheit.

"(5) The method of producing a metal-cutting tool adapted to retain its efficiency at high temperatures and in cutting very hard metal, which consists in forming the tool of air-hardening tool steel containing not less than three per cent. of chromium and one or more of the other specified members of the chromium group in amount equal to not less than six per cent. of tungsten, heating said tool or its cutting portion to a temperature of not less than 1,725° Fahrenheit, then cooling the tool to a temperature below 1,550° Fahrenheit, and then reheating it to a temperature above 700° and below 1,260° Fahrenheit."

It is obvious that the question of the validity or invalidity of these patents is highly important, not only to the complainant and defendant, but to all workers in the art, since they apply to substantially all steels for cutting tools in the composition of which chromium and tungsten or molybdenum appear, and to all temperatures applied in treating such steel for such purposes, in excess of 1,725° Fahrenheit. If the patents are sustained, any considerable progress in the art will manifestly be impossible during the period of monopoly thereby granted. This is not stated as a reason why they should not be sustained, if they properly may be, but rather to indicate the serious nature and importance of any conclusion that may be reached. The character of the invention may be best stated in the language of the application for the first patent:

"The object of our invention is to provide a tool capable of working at a higher temperature and consequently of doing more work in a given time or running at a higher cutting speed than are tools as heretofore made.

"Metal-cutting tools have heretofore been made of both carbon tool steels and what are known as 'self-hardening' or 'air-hardening' steels, the latter having the property of working at higher temperatures than the carbon steel, and of assuming a known degree of hardness on being heated to a determined degree, whether cooled rapidly or slowly, while the carbon steels, after being heated to degrees depending on their composition, are hardened by their being suddenly cooled, as by plunging in water and then subjected to the treatment known as 'drawing the temper,' to reduce their hardness to a proper degree and impart the necessary toughness to the tool. In the treatment of both classes of steel it has always been recognized that what is known as 'overheating,' either in making, dressing, or treating the tool, is to be carefully avoided under penalty of most material injury to the tool, and the points at which overheating occurs are carefully studied and well recognized in the trade. In the case of the air-hardening steels the maximum temperature considered permissible is that indicated by a bright cherry red, which color we have found by careful observation to indicate from 1,500° to 1,550° Fahrenheit. Above this temperature tools made of air-hardening steel rapidly deteriorate, and all makers of such steel are careful to caution their customers not to heat such tools above this temperature. It has also been found in practice that the higher range of temperature below the bright cherry red to which air-hardening steel tools are subjected in making and dressing there are great irregularities in the hardness and durability of the tools and par-

ticularly in their capacity to remain efficient at high-working temperatures caused by their use in cutting metals. Consequently such tools must, as a rule, be run at a less rate of cutting speed than individual tools are capable of without injury, because practically similar treatments of tools made from the same steel cannot and do not insure similar heat-resisting qualities while working. Our invention is based on our discovery that, while it is true that tools made of air-hardening steels all rapidly deteriorate at temperatures in excess of a bright cherry red (though it must be understood not all at the same temperature), it is also true that, when air-hardening steels are made with certain constituents in ascertained proportions, this deterioration only prevails during a limited range of temperature above the bright cherry red—that is to say, from about 1,550° to about 1,700° Fahrenheit (corresponding to a light salmon color)—and on our further discovery that above this range of temperatures, which we call the 'breaking-down point,' and from 1,725° Fahrenheit up to a temperature at which the steel softens or crumbles when touched with a rod (approximately 1,900° to 2,000° Fahrenheit), the efficiency of tools of such special steels—that is to say, their cutting speed and also their uniformity in efficiency—is greatly increased, and largely so in proportion to the degree of heat to which they are raised. This is so much the case that their cutting speed may be stated to be from one and one-half to two and a half times that of the tool heated, as heretofore, to temperatures below the breaking-down point."

It should be observed at this point that the patentees did not invent any new composition or any improved composition of steel. This is not only impliedly admitted by the patents, but several prior patents are in evidence showing chrome-tungsten steels of a composition within the terms of the patent. Furthermore, upon this point Mr. White, one of the patentees, testified as follows:

"Q. Is the Taylor-White steel a high or low carbon steel? A. I don't know that there is any such thing as Taylor-White steel. Our patent simply claims a process for the treatment of a steel of certain limited compositions. Q. And this composition was not novel with you, as I understand it? A. No; this composition was on the market at the date of our invention. Q. The novelty, or improvement, if any, lay in the method or process? A. Entirely."

Notwithstanding, however, that the patentees were in no sense inventors of the steels referred to in the several claims of the patents, they in the first patent apply their methods of tool-making by one set of claims to steels containing not less than 1/2 per cent. chromium and 1 per cent. tungsten, and by another set to steels containing 1 per cent. of chromium and 4 per cent. tungsten, and by all the claims of the second patent to an air-hardening tool steel containing not less than 3 per cent. chromium and not less than 6 per cent. of tungsten. All of the claims, therefore, specify tool steels containing certain percentages of chromium and tungsten, but they are clearly not limited to the percentages thus specified, since they include, or some of them do, all percentages in excess thereof; thus, taking the first claim of the first patent as an example, it is apparent that the only steels of the chromium-tungsten composition not included therein are such as contain less than 1/2 per cent. of chromium and 1 per cent. of tungsten, or some other member of the chromium group, as molybdenum. This gives to the claim an extremely broad scope. The method of the patents is applied to almost every possible percentage of the chrome-tungsten composition of steel.

The patentees, in the language of the specification above quoted, state that their invention was based upon their alleged discovery in

tempering steels; that there existed what is called in the patent "a breaking-down point" between 1,550° and 1,725°, and that in the prior art, because of this alleged "breaking-down point," steels were not heated above 1,550°. They say in effect that the fact that steels could not be heated above a bright cherry red or a temperature of about 1,550° was thoroughly well recognized in the art, and that their discovery consisted in ascertaining that by passing beyond that hitherto seemingly impassable boundary, and heating the steel not as theretofore to 1,550° only, but up to 1,725° and far higher, its hardness, toughness, and cutting quality were greatly increased.

It is manifest, therefore, that if such breaking-down point did not exist, or did not exist between the degrees of temperatures named, the patentees made no discovery and no invention; or, again, if workers in the art were accustomed to temper their steel by the application of more or less heat, according to its composition, and in its treatment applied temperatures exceeding 1,725°, the higher limit of the alleged breaking-down point, the patent must likewise fail.

In the consideration of these questions, which to some extent overlap each other, it would seem that the prior art need not and ought not to be strictly limited to what was done in making metal-cutting tools of the precise character indicated in the patent. The questions involved, broadly considered, have to do with the tempering of steel, the use to which the steel might subsequently be put being relatively unimportant. Thus in Lovell Mfg. Co. v. Cary, 147 U. S. 623, 13 Sup. Ct. 472, 37 L. Ed. 307, in which case the tempering of springs was involved, the Supreme Court held that a method of tempering wire clock bells was an anticipation of a like tempering of furniture springs; the real point being, as the court said, that the method had to do with the tempering of the steel wire, and not to the use to which the wire, when tempered, was applied. A reasonable application of this principle would seem to broaden the prior art, for if it were customary to temper steel in analogous arts by the application of very high temperatures, equaling and even exceeding those of the patents, and this without injury, then the application of the same treatment, for a like purpose, to steels for metal-cutting tools would not necessarily involve invention. Before considering whether such a breaking-down point as is described really existed, and, if so, at what point, it should be said that there is much evidence upon both sides of the question, as indeed there is upon almost every point raised in the case. Whatever has been asserted by one party has, as a rule, been strenuously denied by the other. It can, however, be taken as admitted in the art that steels would endure more or less heat without burning or breaking down according to their carbon content; that is to say, the higher the percentage of carbon contained in the composition of the steel, the lower the degree of heat which could safely be applied, and the lower the percentage of carbon the higher the degree of heat which could advantageously be applied. The rule just referred to is well stated by Mr. Fritz, whom Mr. Taylor, one of the patentees, considers the greatest living engineer. The part of Mr. Fritz's testimony referred to is as follows:

"Q. The higher the carbon, the lower the heat which the steel will stand as a rule? A. Yes. Q. And the lower the carbon, the higher the heat which

it will stand? A. Yes. Q. That is a general rule which has long been familiar to those working in the art, is it not? A. Yes, in my experience, anyhow. Q. Then, if a skilled tool-dresser were given a certain piece of steel, he could tell something about how he would have to heat it if he knew the amount of carbon in it, and beyond that the best way for him to find out how to treat the steel would be by experimenting with it? A. Well, if you know the composition of the steel, you can generally tell pretty near what to do with it."

In this connection it should be added that the prior art discloses many varieties of steel, the earliest being what was known as "carbon," or "cast steel." Afterwards there was a carbon steel to which tungsten, or sometimes manganese, was added as a hardening element; later followed the chrome-tungsten steel; still later came what are known as the "high-speed steels." These likewise contain carbon, chromium, and tungsten, the percentage of each of these elements, however, being carefully determined and measured. One of the witnesses for the defendant, a practical steel man, classified the steels known in the prior art as carbon and alloy steels, grouped in three or more groups. He then placed the alloy groups in the order of their development as follows: Manganese, chrome and tungsten, and chrome and molybdenum; and stated that these alloy steels are all generally known as air-hardening or self-hardening and high-speed steels. In the high-speed steels the carbon content is very low. Chrome-tungsten steels of proportions well within the composition stated in the patent were known and in general use in the prior art. When it is understood and appreciated that the foregoing classifications of steel are general, and that the constituents of an alloy steel, as well as the percentage of the constituents, vary from time to time, the wisdom of what Mr. Fritz said in respect of the experimental method necessary to determine their proper treatment becomes increasingly apparent.

Upon the question of whether or not the breaking-down point of the patent did in fact exist, it should be remarked that no publication has been offered in evidence, or referred to, which definitely suggests that the prior art recognized that there was any such point; while, on the other hand, many publications, by their specific directions that temperatures in excess of those by which the patent designates the breaking-down point were properly applicable in the treatment of steel, show that no such point was recognized in the art. Furthermore, we have the evidence of many noted experts and practical steel men who testify that they have never heard of it, and Prof. Denton, Professor of Engineering Practice, at the Stevens Institute of Technology, called as an expert for the complainant, testified that he had never heard of it until 1907, when he was informed of its existence by one of the complainant's counsel at an interview in reference to his testifying in this case. Moreover, the patent itself, while claiming that tools made of air-hardening steels all rapidly deteriorate at temperatures in excess of a bright cherry red or about 1,500°, added as a saving clause, "though it must be understood not all at the same temperatures." This statement impliedly admits that steels differ, and that the so-called "breaking down point" cannot, after all, be looked for at a specific point, but may be found anywhere between 1,550° and 1,725°. It tends to show furthermore, what the defendant claims, that steels of various composition

must be treated differently; that the same treatment cannot be applied to all steels, and that to treat all steels alike, without regard to their content, is not, and never has been, regarded in the art as proper treatment. That a workman, or, indeed, any number of workmen, were found who testified that they never heated steel above 1,550° may well be true, and such temperatures may have been entirely proper, or even the best, for the particular steel with which they were dealing, and still their evidence would prove nothing as to the proper heat treatment to be applied, or which actually was applied in the art, to other and different steels. The defendant's experts in their tests were never able to find a breaking-down point, and deny its existence; while one or more of them assert that there is a steady progression in the efficiency of the metal for each hundred degrees rise in temperature. Another speaks of the point as "mythical," and still another, Dr. Hennig, testified as follows:

"Q. What would you say as to a claim made by a certain party or parties in 1899, to the effect that up to that time the highest known temperatures for treating self-hardening tool steel had been 1,550° F.? That the art had stopped at that point, because of a rapid deterioration above 1,550° F., and that such party or parties in 1899 had, for the first time, discovered that such steel could be heated above 1,725° F.? A. Well, that statement is not only incorrect, but it is ridiculous, as even the ordinary carbon steels for hardening are heated up to a cherry red, bright cherry red, which is over 1,800°, and the manufacturers of air-hardening steels labeled their steels, 'When hardening go to a bright cherry red.' And the Mushets in their circular and instructions for treating their steel specified a yellow heat for hardening, which temperature, by all authorities given, were over 2,000° F."

The evidence also establishes that not only was there no knowledge of the breaking-down point in this country, but that the same is true in England. Several men of great reputation, and closely identified both theoretically and practically with the steel industry in that country, have testified unequivocally to that effect. An extract from the testimony of but one of them will be given. Prof. John Oliver Arnold, Professor of Metallurgy in the University of Sheffield, England, than whom there is no better or higher authority produced in the case, says upon this point:

"Q. As a matter of language, would you understand what I meant if I said that there was a range of temperatures as applied to chrome-tungsten self-hardening tool steel within which tools made therefrom rapidly deteriorated, and that such range of temperatures was from 1,550° Fahrenheit to about 1,700° Fahrenheit, and if I assign a name to such range of temperature by calling it the 'breaking-down point'? A. Yes. Q. Assuming, then, the breaking point as thus generally defined, please state, based upon your long experience in connection with this steel, whether there is such a breaking-down point or range of temperatures within which the steel shows a marked deterioration? A. In reply, I say that the existence of any such breaking-down range is opposed to the experience of all high-speed steel makers. As a matter of careful scientific experiment, I have myself ascertained that it does not exist. Q. You base your statement that such breaking-down point does not exist, then, both upon your general experience, and upon certain specific experiments? Is that correct? A. That is so."

Then follow the nature and character of the experiments which he conducted, and to which he referred in his testimony. But perhaps the most striking bit of testimony of all is afforded by the result of

certain tests made at the complainant's works during the progress of this suit, in the presence of some of the counsel and experts of both parties. The primary object of these tests, as stated by Mr. Souther, the complainant's own witness, was "to repeat in open tests what had been done in a so-called secret trial, and clearly show the existence of a breaking-down range for chrome-tungsten tools, and the inevitable response of chrome-tungsten steels to the treatment of the Taylor-White process, so called." It should here be recalled that the patent claims that the prior art recognized that the maximum efficiency of such tools was attained when they were heated to a temperature of about 1,550°, and alleges that thereafter there was a pronounced decrease in efficiency until the temperature had been raised to 1,725°, after which followed a remarkable and constantly increasing range of efficiency until the steel softened, or crumbled, at approximately 1,900° to 2,000°. Turning to the results of these tests, it will be found that they did not at all accord with the theory and statements of the patent. What they did show was that a heat of 1,500°, regarded by the patent as the highest point of efficiency in the prior art, was indeed the lowest point of efficiency; that from 1,550° to 1,600° the same degree of efficiency, or rather of inefficiency, was substantially maintained; and that from and after a temperature of about 1,600°, and not of 1,725°, as called for by the patent, marked improvement was shown. In short, every material assertion of the patent bearing upon the point in question was disproved. In the presence of open tests, the private tests of either party must, to some extent, give way, because they are relatively unsatisfactory; that is to say, ex parte tests will almost invariably be found to support the theory of the party making them. When both parties, however, are represented, the test is, as it were, submitted to cross-examination, and the result is apt to differ from that of the ex parte test as widely as the testimony of a witness given in an ex parte affidavit differs from the testimony of the same witness when subjected to cross-examination. If, then, we accept these open tests at their face value, we would have this startling result, if the statement of the patent as to the prior art be accepted, that it was therein the custom, instead of heating a tool to the temperature which would impart to it its greatest efficiency, to heat it to a point which gave it its least efficiency, and this, notwithstanding the fact that from the earliest times all workers in steels, from the village blacksmith up, were accustomed by the use of a file and by other means, to which reference will later be made, to ascertain when a tool had attained its greatest efficiency. It is difficult to believe that the art made, and persisted in making, the worst possible tools that could be made from the steel at hand. Furthermore, the testimony shows that it would have been impossible to make an efficient cutting tool out of the chrome-tungsten steel in vogue for some years prior to the patent in suit at a temperature below those within the patent in suit. Such steels not only required, but in fact were given, a much higher temperature than that given to the old carbon and cast steel, and a much higher heat treatment than 1,725° named in the patent, as the highest of the temperatures

defining the breaking-down point. The art developed continuously along this line as the carbon constituent was reduced, and the toughening elements were introduced into the composition of steel.

No satisfactory basis appears in the record for the assertion that the patents in suit led up to or were the means of producing or introducing the high-speed steels. On the contrary, such steels were developed normally along lines laid down and recognized prior to these patents. The process of their development has always been gradual, but at the same time consistent and in a single direction, and may well be characterized as one of degree, and the same may be said of their treatment. To repeat, it seems idle to say, under the evidence, that the chrome-tungsten steel of the prior art could have been properly hardened at the same temperature as the carbon steel, or that the high-speed steels of the present day could be as well hardened by applying to them the temperatures applied in the prior art to the chrome-tungsten steel of that day. As the carbon content has decreased and the toughening elements have increased, the steel has invariably and necessarily received a higher heat treatment.

The defendant has demonstrated, although the process of demonstration may not be detailed at length, not only that there was no breaking-down point, as required by the patents, but also that steels of various compositions and designed for various purposes, including metal-cutting tools, were subjected in the prior art to temperatures ranging from 1,750° upwards. They have shown that such steels were heated until they were file-hard, until the steel was covered with a heavy scale, and until its grain became coarse, as the patent states it will become under high temperatures. They have shown, furthermore, that it was subjected to bright red, yellow, yellowish-white, and even white heats. While this color nomenclature of heat temperatures undoubtedly partakes somewhat of the personal equation of the observer, and his location, and is, therefore, not altogether reliable, still it is established, to my entire satisfaction, by the testimony of witnesses, and by authoritative definitions and publications, that the bright cherry red of the patent indicates a temperature far above that therein assigned to it, and probably somewhat in excess of 1,800°, and that the shades of yellow, or orange, and of white are progressively higher, and equal or exceed the highest heat treatment of the patent. Furthermore, while pyrometrical measurements of heat were not in common use prior to these patents, nevertheless, from observations since made by the use of the pyrometer, it has been demonstrated that the heat necessary to produce, in the steels with which we are dealing, the condition above referred to as file-hardness, scaling, and coarseness of grain exceeds 1,800° and comes well within the terms of the patent.

If the composition of steel were always uniform, the best heat treatment for that particular kind of steel, once ascertained, could safely be followed. But inasmuch as the compositions of steel are not uniform but variable, and frequently unknown, it has always been more or less a matter of experiment to ascertain the degree of heat requisite for their proper treatment, and it is this experimental practice to as-

certain what, after all, was merely a matter of degree, that precludes all possibility of invention in the patents.

Turning now to the testimony bearing upon this point, we find that this is just what Mr. Fritz unmistakably meant when, in the passage from his testimony already quoted, he said that if he knew the composition of steel "he could generally tell pretty near what to do with it," and it is moreover, what, as a fact, he himself did whenever a new steel came into his shop. This is apparent from the following questions and answers:

"Q. When the Mushet steel first came into your shop, you tried it and found out what you thought was the best method of treating it, did you? A. Yes. Q. And you could have done the same with any new steel which came into the shop, could you not? A. Oh, yes."

Mr. Fritz testified in 1908, at which time he had been out of the business of manufacturing steel for 14 years, and hence was undoubtedly testifying in respect of his method while in that business. In view of what he says, it must necessarily be inferred that, if any of the steels of later composition had come into use in his day, he would have had no difficulty in ascertaining by experiment, as he had done with Mushet and other steels, the best method of treating them. It cannot be supposed for a moment that, if he had found a steel which did not properly harden at 1,550°, he would have been completely baffled and would have abandoned its use; on the contrary, his own testimony shows he would have experimented with it, and heated it until it did respond, and properly, to the treatment, and in pursuing this course he would have done, as we shall see, no more than other practical men would have done, and uniformly did do, in the prior art.

From the testimony of other witnesses directed to this point, but a few quotations will be made. The complainant's witness Moran, speaking of Crescent steel, testified as follows:

"Q. And you say you never had any instructions as to the best heats at which to heat this steel for forging or hardening it? A. I never had. Q. You simply tried the steel yourself until you discovered what you thought to be the proper heat. Is that right? A. Yes, sir. Q. And I suppose in doing this you tried it at a number of different heats to find out which was the best? A. Yes, sir. Q. And those trial heats would range, I suppose, from a low red up to a white, with such intermediate steps or heats as you thought desirable? A. Yes, sir."

The foregoing questions and answers related to experiments with steel made before 1897. Mr. Unger, a witness for the complainant, and who was the assistant general superintendent of the Homestead Steel Works, testified as follows:

"Q. Mr. Hayes' experiments (Hayes was a young man in the employ of the Crescent Steel Company) consisted in treating different kinds of steel at different temperatures to determine which temperature would be the best for any particular kind of steel, did they not? A. They did. Q. To what temperature did he carry his treatment in order to secure the results which he attained as stated by you in answer to X. Q. 51? A. His experiments covered a range of temperature from a dull red to the fusing point of the steel. The best efficiency obtained on tools was when the tool had been heated almost to the fusing point."

Complainant's witness, Mr. Hastings, also speaks of experiments with Mushet special steel at various heats from a good bright red up

to a bright yellow, although his conclusion was that he got better results with that steel at a good bright red heat than at a bright yellow. Mr. Stafford, also a witness for the complainant, after stating that tool dressers would heat the steel to the temperature best adapted to obtain the desired results, proceeded as follows:

"Q. And expert tool dressers, finally at least, as the result of experience, would go to about the same point in this matter? A. I have found it universally so; in fact, it would have to be so. Q. And that would be as the result of experience based both on going over the desired temperatures and under the desired temperatures? A. At times. Q. And that applied generally to all tool steels? A. Yes, very broadly. Q. And if, then, a new steel was introduced of a different composition from that before known, the tool dressers would have to work with this steel until they found the temperature best adapted for that steel? That is correct, is it not? A. It is, but usually they follow instructions given in circulars."

And this experimental method was substantially that actually employed by the patentees in making their alleged invention, as will be seen by the following extracts from the testimony of one of them:

"Mr. White and I, having consulted together, decided to make comprehensive series of experiments to determine the effect upon the cutting speed of the tool produced by heating tools of this make or chemical composition at heats varying all the way from a black red up to the melting point. It was our original plan to heat these tools to temperatures varying about 50 degrees one from another throughout this range, and in order to carry out this series of tests properly we decided to order a Le Chatelier pyrometer, or, more properly speaking, new wires for the Le Chatelier pyrometer, for they had one at the works at that time.

"It took quite a number of days for this pyrometer to arrive at the works, and in the meantime we decided to take what may be called a preliminary canter through this field by heating tools to successive temperatures throughout this range, and judging these heats merely with our eye, without the use of the pyrometer.

"All of this make of tools—namely, those of the chemical composition referred to above—had been marked with the letter 'L' to distinguish them from other makes. Four of these 'L' tools were freshly forged by the blacksmith shop, and then stamped successively as follows: L . L . . L . . . and L . . . .

"These tools were then successively heated at heats between a bright cherry red and a bright yellow heat. L . being heated at a cherry red, L . . . . at a bright yellow heat, and the intermediate tools to heats intermediate between these two points. These tools gave, when used in the experimental lathe, successively higher cutting speeds, L . giving the lowest cutting speed, and L . . . . the highest.

"On October 31, 1898, tools treated as above described were run for the first time, and the final results obtained, more particularly with L . . . and L . . . . , were so remarkable in their nature as to represent the first discovery of the new property in cutting tools which constitutes the subject of our patents."

All of the foregoing testimony was given by witnesses for the complainant. Other of its witnesses, and nearly all of the witnesses for the defendant, have testified to the same effect. In addition, there are a number of extracts from various publications of recognized authority, showing that what has been called in this case the "try it and see" rule, was well known and observed in the prior art. Of the several publications just referred to, a passage is extracted from the Journal of the Iron and Steel Institute:

"Before forging and tempering any steel tool, the best temperature for heating the particular steel should be exactly determined. This may be easily

and rapidly done by forging a bar 0.6 inch square, notching it slightly at 0.6 inch from one end, and making ten other notches at equal distances along the bar. This bar is then placed in the forge fire, so that the first notch is opposite the tuyère, and is heated at first gently to a cherry red, and then with increasing blast, until the end is white-hot and throws off sparks. The rest of the bar then shows a gradual diminution of temperature between the successive notches. It is then rapidly plunged into fresh cold water and tried with a file. A point will be found in the bar that is softer than either end, and by repeating the experience under similar conditions, the temperature of this point may be observed and taken as the point to which heating should be carried in order to obtain the best results in the hardening."

In the same line is an extract from a paper read by one Oscar Harmer, before the London Association of Foremen, Engineers and Draughtsmen, and which appeared in Industries and Iron in the issue of March 23, 1894, in which, speaking of the advantages of gas furnaces for hardening steels, he said that:

"He had found a large proportion of the failure of large cutters due to the improper manner in which they had been heated, and considered that in designing heating furnaces four principal features ought to have consideration: First, it is of the utmost importance that the heat be under perfect control, as some steel must not be heated more than from 1,350° to 1,400°, whilst other steel will not harden at all unless it is at 2,000° Fahrenheit, the range of color between these heats being from dull red at 1,350° to dark orange at 2,000°."

It has already been stated that there existed in the art no such thing as the breaking-down point of the patents in suit; also that it was the common practice in the art to heat alloy steels, like those of the patent, to a point far exceeding the alleged breaking-down point; and, further, that there was a custom, well recognized and generally applied in the art, of testing new steels to heats nearly or quite up to the melting point, and that this method was substantially that pursued by the patentees in making their supposed invention. In view of these findings, it is impossible to see what of novelty and invention there was in what they did. Others were doing, and had done, the same thing. That they, by means of special apparatus, more careful or different treatment, perhaps, and under highly favorable conditions, should have succeeded at one of the best equipped shops in the country in producing, if they did, somewhat better tools than others produced, is neither invention nor evidence of invention.

Several instances of alleged prior public use and anticipations of the patented method are set forth in the record, most of which are both pertinent and important, in view of the fact that the patents are for a method of tempering steel. Nevertheless, a desire to keep this opinion within reasonable bounds will permit only a brief consideration of a single one, that known as the "Crescent public use." This use was carried on at the Crescent works of the Crucible Steel Company of America, and is testified to by seven witnesses. The period of the alleged use is defined with accuracy; that is, with such accuracy that there can be no reasonable doubt that the use prevailed for more than two years prior to the time when application for the patents in suit were filed. The steel there treated was chrome-tungsten steel of a composition within the terms of the patent. It was treated for tool purposes, and so tested as to leave no room for doubt that it was uni-

formly subjected to temperatures which exceeded not only the breaking-down point of the patent, but in many cases the highest heat suggested in the patents. It was without question the high heat treatment of the patents. The witnesses who testified to this use are practical men who have for a long time been engaged in the manufacture of tool steels and tools, and the standing and integrity of several of them are vouched for by a number of the complainant's own witnesses. The patents in suit are method patents, and the question—and this cannot be too carefully noted—is not whether the Crescent people made as good a tool as the complainant made under the patents, but whether, in making similar tools, they pursued substantially the same method. Unless human testimony is to be ignored, I fail to see why the facts developed by these witnesses do not show prior public use of the method of the patents in suit. Some attempt was made to break down this testimony, but, in my judgment, it signally failed. Moreover, the complainant insists that the use was not public. It is shown, however, to have been the uniform and systematic method of steel treatment followed in the Crescent works for a number of years. The employés all knew of the method pursued, and there was never, at any time, any injunction of secrecy placed upon them; the only possible suggestion of secrecy lay in the fact that the general public was not admitted to the works without a permit from the office, but this was done to avoid the risk of accident, and is a rule commonly enforced in factories. Such a restriction is not inconsistent with a public use. Nor does the testimony of the witnesses as to the Crescent use, including, as it does, the degree of heat to which steel of the composition of the patent was uniformly subjected at that plant, and the method of treatment there pursued, rest solely or chiefly upon color definition, although that class of testimony shows that the steel was heated to a yellow and in some cases to what is called a full yellow heat. But beyond that, the witnesses all state that the tools were made file-hard; or in other words, that the steel had been heated to so high a temperature, and was so hardened thereby, that it could not be marked or scratched with a file; further, that the steel was heated to a free scaling heat or to a yellow scaling heat, which the weight of the testimony shows to have been considerably over 1,800°, and also that the excessively high heat treatment pursued was manifested by a coarsening of the grain of the steel. Furthermore, it appears that the Crescent steels, after treatment, were submitted to still another test known as the "blue grinding test," by which it was demonstrated that the tools thus treated would not give way when heated by friction, even though the friction were carried to an extent which would color the sharpened edge of the tool to a blue. These physical manifestations, peculiar to steels which have been highly heated, speak more loudly and convincingly than could any mere color indications. Again, not only was it recognized in the art that file hardness, free scaling, and coarsening of the grain could only be produced by exceedingly high temperatures, but by the subsequent use of the pyrometer it has been established, as already mentioned, that such conditions happen, and can happen, only when steel has been heated to temperatures well within the patents. It is difficult to see how the Crescent use can be ignored. The facts are clearly shown, are

not incredible, but in entire accord with much other testimony, and the witnesses are unimpeached.

As above stated, other prior public uses and anticipations have been set up, which, for the sake of brevity and not because they lack support, will not be discussed. They have, however, been considered; and it is only after a careful review of the entire case that I have reached the conclusion that the patents are invalid. The patentees did only what a multitude of others were doing. All alike experimented along similar lines with the same object in view, and obtained results, which at the most, differed only in degree. There is so much testimony supporting this view that the opposing testimony is, in my judgment, completely overborne.

No small part of the complainant's testimony has been offered for the purpose of showing the utility of the patents. Several of its experts in their testimony have read into the record highly laudatory extracts of articles relating to them from various publications. So much store has been set upon these that, with few exceptions, they appear in the record at least twice, and one of them three or four times. Such matter, if it were evidence at all, would be evidence of a low order. But upon what theory can it be regarded otherwise than as hearsay evidence? It is not known, in any legal sense, why the articles were written; who inspired them; who was their real author; what the source of his knowledge, or anything of his integrity, reputation, or experience. These are but a few of the many queries which instantly suggest themselves. It was hearsay testimony, and was not purged of that vice by being filtered through the mouth of an expert. If the authors knew anything of value concerning these patents or their utility they should have been produced, and the source and accuracy of their knowledge tested in the usual way. Moreover, it should be noted that with two or three exceptions all of the articles, from which only portions have been culled, were written after this suit was instituted, and that a large majority of them first appeared in foreign countries. The importance of having the entire articles presented, instead of extracts therefrom, is well illustrated by a brief examination of the Franklin Institute articles, in the first of which the following statement appears:

"In the operation of the Taylor-White process apparatus is employed by means of which temperatures can be controlled within very narrow limits, which accounts for the uniformity of results obtained with the tools treated by this process. * * * This apparatus offers the still further advantage of hardening and tempering all classes of carbon steels, such as ordinary tempered tools, taps, reamers, milling cutters, etc. By careful operation of the process the best temperatures at which to harden and temper are soon learned, which will insure a uniformity never before attained in these tools."

And quoting from the second article, we have this statement:

"One of the chief claims made by Messrs. Taylor and White is the great uniformity obtained by their process, which makes it possible to run every tool to a very high efficiency. This uniformity is obtained by the apparatus employed, by means of which remarkably close temperatures can be ascertained. * * * The great interest which their work awakened in the engineering world was largely due to Mr. Taylor's system of controlling the men at Bethlehem Steel Works, which made it possible to run every machine to a much higher efficiency than has heretofore been thought of."

At another place in this latter article it is said:

"We think that the great stress should be laid on the apparatus."

Irregularity in the hardness and durability of the tools, and particularly in their capacity to remain efficient at high working temperatures, caused by their use in cutting metals, is noted by the patent as existing in the prior art, and it was the object of the patents to overcome this uncertainty and make the tools uniform in their operation. Mr. Taylor, one of the patentees, in his testimony and also in his article on steel, has dwelt at length upon this same advantage, yet it would seem, from the above quotations as well as by other evidence, that whatever advance has been made in this direction has been by means of apparatus or shop facilities, and methods not at all involved in the patents. This disclosure might not have been made, or so completely made, if the Franklin Institute articles had not been offered in evidence in their entirety.

The evidence also discloses that numerous shop rights or licenses had been granted to various parties in this country, and that the foreign patents embracing the same invention have been sold for large sums of money. An analysis of the testimony upon this point will show, however, that with the shop rights and licenses, and included in the consideration paid therefor, were licenses under various other patents for furnaces and other apparatus used in the practice of the patented process. Hence is does not appear what profit has been derived from these patents, and it is quite possible that the testimony, showing that the real merit and main value of the method lie in the apparatus, is true. Again, in this connection it is remarkable that so much testimony should have been given up to laudatory articles and statements, and so little to the testimony of the licensees under the patents, who must have known of their practical utility if it existed. Furthermore, it appears that the foreign patents upon this invention granted in England, France, Germany, Austria, Switzerland, and Belgium have all been allowed to lapse by their owners for nonpayment of annuity fees or taxes. Then, too, Mr. William Metcalf, one of the authorities quoted by one of the complainant's experts, while in a measure praising the patented method, nevertheless has this to say in the course of an article published in the issue of the American Machinist for July 21, 1904:

"This process consisted in heating a tool excessively hot and cooling it by successive stages, producing a tool that would cut at enormous speed for metal work, and take off chips that developed enough heat to glue them. The process was patented, and therefore it is not necessary to go into a long explanation here, especially as it has been superseded. The process seems to have been uncertain; that is to say, when a tool was handled just right it produced results that were wonderful, and when the manipulations were not exactly right the results were nil."

What appears to be an attempt to unduly magnify the alleged invention may be found in the evidence of one of the patentees, from which it appears that although the discovery of the patent and the one upon which it mainly rests, namely, the heating of tool steel beyond the alleged breaking-down point, was suddenly discovered by the patentees after a limited experiment with four tools by heating them to various temperatures, nevertheless, in order to perfect the invention,

the patentees, as he says, subsequently performed over 16,000 experiments, covering a period of 8 or 9 months, at a cost of somewhere between $50,000 and $125,000. How or why these numerous, protracted, and expensive experiments were necessary, if the invention resides, as it did, and as the patent substantially says it did, in simply heating a piece of steel above the breaking-down point—that is, to a temperature of 1,725° or upwards—it is impossible to discover from the evidence with any degree of satisfaction. Mr. Taylor, one of the patentees, however, says such tools, to be successfully used in the machine shop, must be of uniform quality, and that the experiments were undertaken with that object in view; but the case fairly shows that whatever of uniformity was attained was attained by apparatus or methods or treatment outside of the patents. That special treatment was given to the complainant's tools is apparent from the testimony of the complainant's expert, Prof. Denton, already referred to, who, in speaking of the treatment that its tools known as "T-8" received, says:

"That it was heated to the crumbling point and then plunged in a lead bath at 1,150° for four minutes; that it was then buried in dry quicklime overnight; that it was then preheated three minutes on the framework of the lead bath, then plunged in the lead bath for ten minutes; then buried in the lime and allowed to become cold; then ground for test in the lathe, where it was run twenty minutes successively 60, 70, 75, 80, and 85 feet per minute."

The patent does not disclose any such treatment, indeed, several of the steps are not even referred to therein. It should be stated that the tool above specified was introduced in evidence apparently for the purpose of parrying the effect of the file-hard test, proved by the defendant to be one of the methods which indicated the high temperatures to which metal-cutting tools were ordinarily heated in the prior art, by showing, as the complainant asserted, that tools prepared after its method were not file-hard. Instead, however, of proving this, it showed that the method of the patent in making the tool was not followed.

The case, then, may be summarized as follows: The prior art was radically different from what the patent would lead us to believe. There was no such thing known to the art as a "breaking-down point"; on the contrary, it is established that given a new steel, particularly if the composition were unknown, it was customary to experiment with and test and try it, and thereby ascertain the best method of treating it; that, in pursuing this course, the method of the patent was substantially followed, and temperatures as high as any mentioned therein, or higher, were, not in isolated cases, but in ordinary practice, resorted to. Moreover, as a matter of fact the patentees themselves, in making their alleged discovery, simply adopted the experimental rule which other workers in the art both before and since adopted and used, and if, in the race, the patentees have surpassed others, it has not been through novelty of procedure, but by means of special facilities, apparatus, and methods not embraced in the patents.

These patents in principle are not unlike the one considered and held invalid by the Circuit Court of Appeals for this circuit, in Brady Brass Co. v. Ajax Metal Co., 160 Fed. 84, 87 C. C. A. 240, which turned up-

on the existence or nonexistence in the prior art of a "critical point." The first of the headnotes to that case is as follows:

"A mere difference in the proportions of the constituents of an alloy, however useful the result may be, does not entitle the originator to the monopoly of a patent, where such result was reached gradually by continued experimentation by the patentees and by others, all leading toward the same proportions, and the final product differs from those of the prior art only in degree."

It is with regret that, before closing, I feel constrained to give expression to the following criticism. The complainant's case, aside from the testimony of its expert witnesses, rests in no small degree upon that of a witness who, in the first instance when called by the defendant, showed a lack of memory, and an unwillingness to testify, as to matters concerning which it would seem as if he must have had more knowledge than he chose to reveal. However, when this same witness was called by the complainant, a marked improvement in his attitude and memory is noticeable, and he became a mainstay of its case. The record discloses, and it is undisputed, that not only this witness, but another important one, refused to testify for the complainant, until after it had entered into an agreement with them by which, in consideration of their testimony, if the patents in suit were sustained, they were to have licenses thereunder. The testimony of witnesses whose compensation is contingent upon the success of the party in whose behalf they testify, whose contingent compensation is furthermore an interest in the very subject-matter of the litigation, who refuse to testify until after such contingent consideration is promised, who thereupon testify pursuant to the arrangement, and subsequently demand and accept such contingent compensation, cannot but be impaired. Nor is this all, for the first of the witnesses referred to, in the first instance, demanded a pecuniary consideration for testifying, which he admits he regarded as prohibitive, while the second threatened to withdraw his testimony because of some delay in the delivery of the license which he was to receive as compensation. It is not merely that such witnesses are interested, for that does not fully express their status; it is rather the character of their interest and the method of its acquirement; they dickered with the complainant for an interest in the res as the condition of their testifying. Their compensation, so far as they knew, was dependent upon the strength of their testimony, and they had every inducement to make it effective. Furthermore, when testimony is first bartered for by a complainant in a court of equity, under circumstances like the above, and the testimony given pursuant to the bargain is accepted and used, not only its equitable standing, but the strength of its case, is likewise impaired. for the suggestion will not down that, if some witnesses have testified under such an arrangement and for such a consideration, other witnesses in the case may have done the same thing. If testimony of this character is acceptable upon the equity side of the court, it is not improbable that we shall soon have witnesses testifying in damage cases upon the law side, upon contingent fees of 5 per cent. or 10 per cent. of the amount of the verdict. Conduct of the character above outlined, if not contrary to public policy, is certainly near the border line.

166 F.—57

It is needless to discuss the second patent; it is so involved in the first that it must fall with it. Both are invalid.

The bill of complaint will be dismissed with costs.