## AMERICAN STAINLESS STEEL CO. v. LUDLUM STEEL CO.

(Circuit Court of Appeals, Second Circuit.   April 16, 1923.)

### No. 233.

1. Patents ☞328—1,299,404 and 1,197,256, for "stainless steel," held valid and infringed.

The Haynes patent, No. 1,299,404, for a wrought metal article, and the Brearley patent, No. 1,197,256, for cutlery, both relating to the composition and production of acid-resisting or stainless steel for the manufacture of cutlery. or other articles, where nonstaining properties are desired, the former patent being generic and the latter specific, both *held* not anticipated, valid, and of pioneer rank; also both *held* infringed.

2. Patents ☞65—Anticipating disclosure must show means of accomplishing result.

It requires more than prophecy of what may be done, or declarations of what ought to be accomplished, to constitute an anticipation, or even a good patent reference. It must be shown with reasonable certainty how the desired result can be accomplished.

3. Patents ☞65—Patent for cutlery steel is in art of metallurgy and not of cutlery; "skilled in the art."

The man "skilled in the art," to whom a patent for cutlery steel is addressed and by whose knowledge the sufficiency of its disclosure is to measured. is not the cutler, who makes the article, but the metallurgist, who makes the steel.

[Ed. Note.—For other definitions, see Words and Phrases, Skilled in the Art.]

4. Words and phrases—"Cutler" defined.

A "cutler" may mean either a man who makes edged tools or one who grinds them.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in equity by the American Stainless Steel Company against the Ludlum Steel Company. Decree for defendant, and complainant appeals. Reversed and remanded.

Suit is upon two patents, one (claims 1, 2, and 4) granted to Haynes April 1, 1919, No. 1,299,404; and the other (claims 1 and 3) granted to Brearley September 5, 1916, No. 1,197,256. Haynes called his application one for a "wrought metal article," and Brearley his for "cutlery." But the object of both patentees is the same, and may be shortly described as a desire to produce what has for some years been increasingly well known under the trade-name "stainless steel." Although Brearley's patent date is earlier, his date of application is later, and it may be summarily held that Haynes' is the generic and Brearley's the specific patent.

Haynes declares that his invention relates to the production of wrought metal articles of manufacture "having polished surfaces of the general character which is termed noble, in that such surfaces are incorrodible." Brearley states that his invention relates to the production of "cutlery or other hardened and polished articles of manufacture where nonstaining properties are desired." Both patentees are of opinion that they have shown such desirable product by the use of a described alloy, to wit:

"A worked-down and hard body of an iron-chromium alloy, low in carbon and in other metals." (Haynes.)

"The addition of certain percentages of chromium and carbon to iron, [producing] a steel capable of taking a polish and having the characteristics above referred to." (Brearley.)

Haynes' most specific claim is No. 2, viz.: "A wrought metal tool having polished surface of the incorrodible character of polished surfaces of noble metal, and comprising an alloy of iron and chromium containing from 8 per cent. to 60 per cent. of chromium and from 40 per cent. to 92 per cent. of iron, with carbon in amount between 0.1 per cent. and 1.0 per cent.; said alloy being readily malleable and workable and being substantially free of other metals."

Brearley's definition of his own invention is best found in his first claim, viz.: "A hardened and polished article of manufacture composed of a ferrous alloy containing between 9 per cent. and 16 per cent. of chromium and carbon in quantity less than seven-tenths of 1 per cent."

Defendant is alleged to infringe by making and selling certain kinds of steel known by the trade-names of "Nevastain" and "Silchrome." The ultimate manufactured article, tool, or implement does not appear to have been made by the defendant, but what it sells is by its own commercial literature described thus: "Nevastain is a high chromium-silicon alloy completely resistant to the effects of fruit acids. * * * It is particularly adapted for exposed surfaces which have to withstand the combined action of salt water and the atmosphere. It can be hardened by the usual methods, and made file hard, and can then be drawn to requirements. * * * Nevastain steel, when polished, will retain its high finish indefinitely. The atmospheric dirt can be readily removed by soap and water." "Silchrome is very resistant to the action of acids, organic and inorganic. It will not stain when subjected to the fruit acids, providing the steel has been hardened."

The usual defenses were interposed, and the court below in a careful and able opinion by Learned Hand, J., set out substantially all the facts adduced at hearing, and held that the Brearley claims in suit could not "create a monopoly over the whole extent which they claimed," but that said claims might be considered (for argument's sake) "valid for as much of the field as [Brearley's] invention really covers." No definite finding of validity was made in respect of Haynes, but noninfringement of both patents was declared (as to Brearley), because, if his disclosure were followed, defendant's alloy or composition "would become hard and would not become

stainless," and as to Haynes his disclosure nowhere indicated any method of rendering stainless what defendant had made and sold.

From decree dismissing bill for noninfringement, plaintiff appealed.

Charles Neave, of New York City, Marshall A. Christy, of Pittsburgh, Pa., and Maxwell Barus, of Boston, Mass., for appellant.

Kenyon & Kenyon, of New York City (Allan D. Kenyon and Herbert Dyke, both of New York City, of counsel), for appellee.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). [1] Judgment in this case seems to us primarily to depend on ascertainment of patent validity and scope. This is a prerequisite to determination of the place in the art, or that branch of art, to which the patents belong. If this invention be found broadly new, meritorious in ingenuity, and lying at the foundation of a wholly novel development of human labor, it should receive in construction a liberality too well recognized to need additional exposition, though we may point out that Treibacher v. Roessler, 219 Fed. 210, 135 C. C. A. 108, is a rather striking illustration of such appropriate liberality.

The history of steel is almost as old as that of commerce, and the story of its use for tools of every kind a commonplace; but equally has it heretofore been a commonplace that, unless kept bright by repeated polishing or protected with oil, the steel utensil was expected to lose its luster, and especially have all steel articles needed protection from the common acids of human food, something usually at hand, and certainly as much needed as steel itself.

The difficulty of producing a steel resistant to what is roughly called "corrosion," even by some of the experts testifying herein, has long been recognized. That compound of pure iron and the carbide thereof, which is steel, has itself been admixed (for many purposes) with other and more infrequent metals; e. g., nickel, tungsten, etc., and chromium. Ferro-chromium is one form of admixture; and the fact that ferro-chromium itself was well known to be peculiarly resistant to powerful acids doubtless suggested years ago that some chromium alloy might be at once useful for many of the commercial purposes of steel and yet maintain its polished luster.

[2] This record is replete with accounts of speculations on this subject and dissertations thereon by men confessedly skillful in their day in the arts of steel making and metallurgy. These publications have been advanced by defendant to minimize the inventive concept of Haynes and Brearley. To us they magnify it. There are many inventions which seem to have been gathered, as it were, from the scrap heaps of human effort. They appear to observers as the results of accident, rather than intelligent design. But where men, doubtless well equipped for a particular sort of work, have hoped and investigated and even prophesied as to what could be done, but never did it, and other men similarly equipped have by intensive study and skillful experiment succeeded, such success commands and should receive a greater meed of intellectual appreciation than is accorded even to the cleverness of picking up and utilizing an unconsidered or discarded trifle.

When to the scientific triumph of succeeding where other scientists have failed is added the development of a new branch of industry, the word "pioneer" may well be accorded to the patent which describes and defines, even though lamely, the essentials of such success.

Half a century ago Woods and Clark (British No. 1,923 of 1872) filed provisional specification for an "improved alloy for anti-acid metal"; but they never completed their application. Of this abandoned disclosure defendant declares that these men "taught the world * * * that high chromium ferrous alloys, consisting of low carbon Bessemer steel and high chromium content, with more or less tungsten," could be used to produce stainless alloys, and it is urged that "the patents in suit have added nothing to that knowledge." On the contrary, our inference is that Woods and Clark must have thought little of their own concept, as they dropped the matter at once; while examination of their disclosure shows that their preferred alloy for "anti-acid metal" was made in proportions wholly wrong, while their methods of production were merely impossible. They were perhaps among the prophets; but it requires more than prophecy of what may be done, or than declarations of what ought to be accomplished, to make a good patent reference, not to speak of an anticipation. It is necessary to show with reasonable certainty how the desired result can be accomplished. Westinghouse, etc., Co. v. Great Northern Co., 88 Fed. 258, 31 C. C. A. 525.

In 1892 Sir Robert Hadfield investigated chromium steel and published his results. That publication we regard as potent evidence of what were then regarded as insuperable difficulties in attaining permanent luster in steel. We accept that eminent steel maker's statement, made in 1916, that he in 1892 saw no way of utilizing low-carbon high-chromium steel for making articles capable of remaining untarnished in contact with the common acids.

We have taken from the historical evidence one example of thought expressed in a patent specification, and one of thought expressed in scientific dissertation; the quotations might be much extended, for all the evidence unites to prove that steel of a polished luster, secured by its composition against the commoner forms of acid or corrosive attack, was something sought for, suspected as possible to come from chromium admixtures, but never obtained until contemporaneously in England and the United States Brearley and Haynes, proceeding along similar lines and having in view substantially the same purpose, produced as a new article of manufacture a wholly novel product, and something almost in denial of previous scientific disclosure, "stainless steel." To such an inventive concept the often misleading word "pioneer" may fairly be applied.

Having thus given our view of the rank of this inventive thought, the question is crucial (in considering validity): To whom were these patents addressed? Who were the "men skilled in the art" to whom they spoke, and by whose intelligent appreciation they are to be measured as to clarity and sufficiency of disclosure?

[3, 4] Here we are constrained to disagree with the learned District Court, where these patents were measured by what a cutler would learn from them, and more particularly from Brearley. A cutler may

mean either a man who makes edged tools or one who grinds them. He has nothing to do with the manufacture of the steel, which for him is raw material. Yet these patents refer to the production or making of a certain kind of steel; they instruct with remarkable precision as to the component parts of the material, which is to be stainless. It seems to us clear that such a disclosure speaks directly to those whose business it is to make the steel, and not to the cutler who is to fashion it.

We have recently considered the meaning of the phrase "man skilled in the art," and concluded that it is always a relative term, and that no absolute definition of its meaning can be laid down as matter of law, because the query as to who is the man skilled in any particular art is itself a question of fact and one having regard to the patent under consideration. Dick v. Barnett, 288 Fed. 799. It follows that we are of opinion that these patents are to be interpreted in the light of what their disclosures would mean to one accustomed to the art of making steel, or to a metallurgist, and not to one who was concerned only with the forming thereof into implements of industry.

What the patentees told metallurgists was that stainlessness might and would be attained by the making of low-carbon and (comparatively) high-chromium alloys when, and only when, what Haynes called "special precautions" were taken in preparation; substantially that crucibles differing from those in ordinary use should be availed of, in order to prevent the proximity and consequent admixture of carbonaceous matter during the process of melting. Haynes thought that he could use either electric or fire heat, while Brearley preferentially recommended an electric arc melting furnace. The product of both depended upon the making (under melting conditions as above set forth) of an alloy of iron in which the admixture of chromium was in Haynes to be from 8 to 60 per cent., with a content of between 10 and 25 per cent. preferred; and in Brearley (who devoted himself to a material particularly suitable for tools) between 9 and 16 per cent.; while Haynes' carbon might run from .1 to 1 per cent. and Brearley's must be less than .7 per cent. The patented product is according to Haynes to be (inter alia) a *"hard* body of an iron chromium alloy," and according to Brearley, "a tempered steel *hardened* article." The noninfringement hitherto declared is based on consideration of the word "hard" or "hardened."

Defendant's "Nevastain" and "Silchrome" show an average (in figures near enough for discussion) of carbon .43, chromium 9.73, and an addition of silicon 3.84. Leaving silicon out of consideration for the moment, and accepting defendant's laudatory comments on its own product (prefixed to this opinion), it is evident that the alleged infringing articles have taken, not only the proportions of both patents, but (as will appear on closer reading of his disclosure) the especially preferred compound or admixture of Brearley. It was found below and (as may be assumed for purposes of discussion) that such steels as Nevastain and Silchrome "will often (it is believed always) become *hard* if heated to the critical temperature taken with the utmost liberality, but will not be stainless. They must be heated further, and to 1700° F., to acquire that second character" of stainlessness. The de-

gree of heat indicated is distinctly above the critical temperature of ordinary steel.

This means, without going into a detail which may be pursued in the opinion below, that since the patents were addressed to the cutler, and the cutler was accustomed to harden steel, which is his raw material, by heating to and slightly beyond what is known as the "critical temperature," he ought to have been told by the disclosure, not only that he must harden steel (which was an old story), but to just what degree of heat he must proceed in order to attain not only hardness but stainlessness.

It is admitted that both the patents plainly disclose a hard steel, particularly when the chromium is low, and it is also admitted that the process of hardening generally is not a matter of heating to a fixed point. While it has long been known that the critical point of any steel may be indicated by pyrometric instruments, well known in commerce, it is also proven that even among artisans, including cutlers, the practice of skilled men has been to determine the proper hardening or heating point empirically. We do not go into the exact number of heat degrees above the critical point of ordinary steel, to which steels like defendant's or Brearley's preferred product (minus the silicon) must be heated to insure stainlessness, because we do not think the exact number of degrees makes any difference, and are of opinion that such higher degree of heat is very far within the professional knowledge of the metallurgist or steel maker by whose competency these patents are to be judged. Indeed, we are of the opinion that the determination of such proper degree of heat is within even the range of a workman's competency under what has been called the "try it and see" rule. Cf. Bethlehem, etc., Co. v. Niles, etc., Co. (C. C.) 166 Fed. 880, affirmed 173 Fed. 1019, 98 C. C. A. 640; Pittsburgh, etc., Co. v. Seaman Co., 248 Fed. 705, 160 C. C. A. 605.

It is worthy of note that this slight extra or additional heating, in order to insure stainlessness, does not affect the whole range of proportions as prescribed by either or both patentees. It seems to be true of a comparatively small number of the possible and contemplated variations in carbon and chromium content. The reasons for it are not apparent—to us, at all events. Defendant in effect insists that, since the invention relates to stainlessness, and the instructions on that subject are good for all but a small area of the ground covered by the claims, he is free of infringement if he stays in that area. The argument does not prevail, because we think the instructions good enough for the class by whose attainments the disclosure is to be tested.

The facts of this particular case seem to us a perfect illustration of the unfairness of reading these patents by the light of a cutler's (rather underestimated) workaday knowledge. If the patents were to be judged by what a cutler could make out of them, and it were true that the best cutler did not know enough to properly harden the stainless steel of the patents after reading the disclosure, such ignorant workman could never infringe. But the defendant is not a cutler, but an incorporated steel maker, equipped with the professional skill of metallurgists; and it is plain enough that the patents were full of instruction

for men of the grade of the infringer, and it is to us a strange argument that substantially alleges noninfringement of a patent by a metallurgist, because a cutler would not understand what the patentee was trying to express, when the metallgurist had no difficulty in the premises.

It was held below, and has not been here successfully disputed, that, omitting silicon, defendant has produced stainless steel; with the silicon added, it has also produced stainless steel; therefore, in respect of infringement, the silicon is immaterial, no matter how beneficial it may be. It was not thought necessary below, and we do not think it necessary, to dwell upon the differences between the Haynes and Brearley patents. It is enough for the purpose of this case that defendant's product is within the disclosure of both. Whether there may not be in Haynes an attempt to cover too much ground is a question that may be left until occasion for decision arises.

Decree reversed, with costs, and case remanded to the District Court, for further proceedings in accordance with this opinion.