BRADY BRASS CO. v. AJAX METAL CO.

(Circuit Court of Appeals, Third Circuit. February 21, 1908.)

No. 67.

1. PATENTS—INVENTION—CHANGING PROPORTIONS IN ALLOY.

A mere difference in the proportions of the constituents of an alloy, however useful the result may be, does not entitle the originator to the monopoly of a patent, where such result was reached gradually by continued experimentation by the patentees and by others, all leading toward the same proportions, and the final product differs from those of the prior art only in degree.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, § 19.]

2. SAME—ALLOY FOR JOURNAL BEARINGS.

The Hendrickson & Clamer patent, No. 655,402, for an alloy for antifriction bearings "consisting of less than seven per cent. of tin and more than twenty per cent. of lead and the balance of copper," is void for lack of invention in view of the prior art.

Appeal from the Circuit Court of the United States for the District of New Jersey.

For opinion below, see 155 Fed. 409.

Morgan J. O'Brien, for appellant.

A. B. Stoughton, for appellee.

Before GRAY, Circuit Judge, and McPHERSON and CROSS, District Judges.

GRAY, Circuit Judge. This is an appeal from an interlocutory decree of the Circuit Court for the District of New Jersey, in a suit charging infringement of letters patent No. 655,402, for an alloy for antifriction bearings. The decree sustains the validity of the patent, and finds infringement. The specifications and claim are, as follows:

"One object of the present invention is to fill a recognized want and provide an alloy for journal bearings which shall hold up within itself more lead than was heretofore possible without the use of nickel, which is claimed in our applications serially numbered 737,304 and 737,305. It is generally known by those skilled in the art that the lead in a copper, tin, and lead alloy is only mechanically held, while the copper and tin are not a merely mechanically-mixed alloy nor a simple solution of the one in the other, but in certain proportions they are a chemically-constituted compound, and if an excess of either one or the other constituents is present there will remain one or more not chemically-combined ingredients outside of the crystallized chemically-combined constituents. The elements tin and copper when brought together in the molten state combine to form several well-defined compounds, such as $SnCu_3$, $SnCu_2$, $SnCu$, according to the amount of tin present. Any excess of tin above that required for the formation of these compounds will mix with the copper to form the so-called 'eutectic' alloy. This part of the alloy has a much lower melting-point than any of the chemically-combined crystallized portions and acts as the cementing material. The first of the compounds solidifies in the mass at a temperature between 1,700° and 1,800°, and the eutectic alloy being rich in tin and having a formula of seventy-three parts copper and twenty-seven parts tin does not solidify until the mass has cooled to about 930° Fahrenheit. We have discovered that a much higher percentage of lead, which is desirable, can be added to such alloy containing less than seven per cent. of tin than can be added to such alloy containing more than seven per cent. of tin, because the alloy containing less than seven per cent. of tin when poured, for example, into green-sand molds contains very little or none of the eutectic alloy. Consequently the whole mass will solidify at a comparatively-elevated temperature and in so doing will hold up the lead, so that a comparatively-large proportion of it, as more than twenty per cent., may be introduced without separation.

"To make our improved alloy, the copper is heated and melted until it is thoroughly liquid. The tin and lead are then added in the proportions of under seven per cent., by weight, of tin and not less than twenty per cent., by weight, of lead. The alloy is then cast in suitable molds, which may or may not be of green sand.

"We are aware of the fact that our alloy may be built up by the use of brass scrap which, as is well known, may contain, in addition to copper, antimony, zinc, iron, arsenic, phosphorus and bismuth and any and all soft metals in varying proportions.

"It will be obvious to those skilled in the art to which our invention appertains, that modifications may be made in details without departing from the spirit thereof. Hence we do not limit ourselves to the precise mode of procedure hereinabove set forth; but, having thus described the nature and objects of our invention, what we claim as new, and desire to secure by letters patent, is, a bearing consisting of less than seven per cent. of tin and more than twenty per cent. of lead and the balance of copper, substantially as described."

The patent is therefore for a product, and not for a process. A copper, tin and lead alloy for journal bearings is, as admitted by the patentee, old in the art, and journals made of such an alloy had been used long prior to the date of the patent. There is no claim for any particular method of combining the constituents of this alloy, and the specification only states the ordinary foundry practice well known and recognized by those skilled in the art. The discovery, as alleged, is "that a much higher percentage of lead can be added to such alloy containing less than seven per cent. of tin than can be added to such alloy containing more than seven per cent. of tin, because the alloy containing less than seven per cent. of tin, when poured, for example, into green-sand molds, contains very little or none of the eutectic alloy." In the making and use of this copper-tin-lead alloy, it had long been known, as stated in the specifications of the patent in suit, that, while the copper and tin unite intimately together, so as to approach almost a chemical union, the lead is held mechanically in the interstices of the copper-tin alloy. The lead, being soft and plastic, acts as the lubricant, which gives the chief value to the alloy as a journal bearing material. As said by the experts, the copper and tin, when united, form a matrix for the holding of the lead, the small interstices acting, as it were. as frames into which the lead disposes itself.

It is not necessary for us to inquire just how the tin added to the copper promotes the efficiency of the alloy for the purpose intended. The patent itself speaks of the whole mass of copper and tin solidifying at a comparatively elevated temperature, and that in so doing, it will "hold up" the lead, which fuses and solidifies at a much lower temperature. It would appear, also, from the discussions by the experts, that the copper alone, while giving strength and toughness, has not sufficient hardness, and this hardness is increased by the amalgamation with it of small quantities of tin. Whatever may be the true metallurgical function of the tin in this alloy, it had been recognized long before the date of the patent in suit, that a proportion of tin relatively smaller than that of the copper, or even the lead, was necessary to the efficiency of the product. Lead being the more plastic constituent and forming, so to speak, the lubricant in the alloy, the problem presented in the prior art was to produce the alloy with a maximum of lead. It was found that, when tin was used in undue proportion, there is produced, besides the tin-copper alloy solidifying at a high temperature, another and nonhomogeneous alloy, which only solidifies at a much lower temperature and tends to segregate some of the molten lead, which liquidates at the bottom of the casting, and to prevent its proper distribution through the mass. This is the eutectic alloy mentioned in the specifications of the patent in suit. To obtain as much as possible of the desirable lead constituent in the alloy, it was necessary to reduce the tin. These matters were all understood in the trade long before the application for the patent in suit, and efforts were being made to solve the problem.

Apparently, it was thought that the limits within which the proportion of tin could be safely reduced with beneficial results, were narrow, as a certain amount of tin was necessary to hold the lead al-

loyed with the copper, and to give the copper-tin alloy the necessary hardness. Nevertheless, it was well understood that, as the proportion of tin was decreased, a larger proportion of lead could be homogeneously distributed through the alloy. In February and March of 1892, Dr. Dudley, a distinguished metallurgist and chemist employed by the Pennsylvania Railroad Company, who devoted much time and study to the composition of journal bearing alloys, and whose high reputation is recognized by counsel on both sides, published an article in the Journal of the Franklin Institute, on "Bearing Metal Alloys." In this article, Dr. Dudley discusses to some extent the history of the art of "Bearing Metal Alloys," and especially of the copper-tin-lead alloy, as used in railroad car journals. As to this, he says:

"The value of lead in a copper-tin alloy for bearing metal, being apparently so well established, it became a question of how much lead could be gotten into the alloy without running into difficulty."

As he is here speaking of the art prior to 1892, we may remark in passing that there can, of course, be no claim for discovery of the adaptability of a copper-tin-lead alloy for use as a bearing metal at the date of the application for the patent in suit, to wit, March 7, 1900. Further on in this article, Dr. Dudley says:

"It should be stated here, that as the amount of tin is diminished, and the amount of lead is increased, the tendency of the metal to yield more readily under pressure increases, so that it becomes essential to guard against possible dangers of having a metal which would yield too readily under the load. After considerable preliminary work, bearings were cast and a wearing test made, the results of which are as follows, the new metal being called alloy 'B':

"Alloy 'B' v. Phosphor-Bronze.

| | Composition Alloy B. Per Cent. | Composition Phosphor-Bronze. Per Cent. |
|---|---|---|
| Copper | 77.00 | 79.70 |
| Tin | 8.00 | 10.00 |
| Lead | 15.00 | 9.50 |
| Phosphorus | none | 0.80" |

After commenting on the successful manufacture and use of journals made of alloy "B" as above described, he proceeds to remark that:

"It is not at all certain, however, that a still further modification in the diminution of tin and increase of lead, would not give even better results. Some experiments have been made towards still further diminishing the tin, and increasing the lead, but it is found that a certain amount of tin is necessary to hold the lead alloyed with the copper, and apparently the limit of the diminution of tin and increase of lead is not a great ways from the composition of alloy 'B.'"

Dr. Dudley, in a paper published in the Railroad and Engineering Journal, in February, 1892, again says:

"All we can say is, that all the experiments made show that, both in regard to heating and in regard to loss of metal by wear, no other bearing metal that we have experimented with gives as good results as the Ex. B. metal. It is entirely possible that a still further diminution of tin and increase of lead might give better results."

Prof. John W. Langley, an expert witness called on behalf of the defendant, 63 years old, a graduate of Harvard University, and who states that he has been all his adult life engaged in scientific and technical teaching, or in metallurgical manufacture, after testifying as to the list of copper-tin-lead alloys known to the trade in 1892, as stated by Dr. Dudley, testifies as follows:

"The above shows a progressive increase in the lead, and a partial uniformity in the decrease in the tin, both changes being progressive proximations toward the composition of copper 73, tin 7, and lead 20, which is that of the patent in suit, and would show that this latter is a mere change in proportions towards which the state of the art was already drifting, and therefore did not involve an act of invention, or introduce any changes other than those already in progress in the normal development of the art."

We do not think this conclusion of Prof. Langley is successfully controverted by any evidence disclosed by the record. The product for which claim is made in the patent in suit, was clearly the result of experimentation on the line pointed out by Dr. Dudley eight years before. It is hard to imagine, even, how it could have been otherwise obtained. Dr. Dudley understood, and doubtless others did, that there might be a still further reduction of tin without destroying its necessary function in the alloy, which would thereby permit a larger proportion of lead to be used. In fact, there is, we think, satisfactory evidence that such an alloy was successfully made by the Brady Metal Company, during the period between 1892 and the date of the application for the patent in suit, in which the proportions of tin and lead were within the limits prescribed in the claim of the patent. We are not concerned now with the criticism made upon this particular manufacture, as evidence of a prior public use. We only deal with it as an admitted fact, showing that the experimentation and the results were in line of Dr. Dudley's prediction of 1892. It was a practical advance in the art, which experience and continued experimentation would seem to have made inevitable.

Aside entirely from any consideration of the alleged anticipation, the alloy of the patent in suit differs from those that preceded it, and notably from that of Dr. Dudley's Exhibit "B" alloy, only in degree. That this is so, we think is abundantly supported by the evidence already adverted to, and by the weight of the testimony taken as a whole. Dr. Dudley, notwithstanding his contribution to the art, and his having at one time expresed his opinion that the alloy of the patent in suit had probably been anticipated, and was not entitled to the monopoly that had been granted to it, afterwards changed his mind and, with rare modesty, attributed to the patentees a merit which he might as well have claimed for himself. He was therefore called as a witness by the complainant. Upon cross-examination, however, he testified, as follows:

"XQ. 23. At the time of writing that article (of February 1892), you recognized, did you not, that it was advisable to slightly decrease the amount of tin and slightly increase the amount of lead in the Exhibit B metal?

"A. I should say yes, a more valuable bearing metal would be obtained by such changes.

"XQ. 24. Can you point out any difference, except a difference of degree, between the Exhibit B metal, and a bearing metal composed of less than 7 per cent. tin, more than 20 per cent. lead, and the balance copper?

"A. I should say the valuable properties of the latter metal would be greater than these of the Exhibit B metal, all our experiments indicating that a diminution of tin and increase in lead in bearing metals gave a more valuable alloy.

"XQ. 25. Are you able to point out any difference, except a difference in degree, in the chemical, physical or mechanical properties of these two alloys?

"A. If by degree, you mean the same characteristics, I should think the alloy containing less than 7 per cent. of tin and more than 20 per cent. of lead, the balance, substantially copper, would have the same characteristics, chemical, physical and mechanical in different degrees as the Exhibit B metal."

Dr. Chandler, one of the complainant's expert witnesses, says upon cross-examination:

"I myself do not know why this alloy I last referred to (meaning the alloy of the patent in suit) is so decidedly better than the other alloy of your question, except because it contains more lead and less tin."

Dr. Richards, an expert witness for defendant, says:

"The two alloys possess the same essential characteristics, and differ only in the degree to which those characteristics are developed. I agree entirely on this question with complainant's witness, Dr. Dudley. * * *

"I know of no such critical difference being observed in the properties of these bearing metals in question when the tin is reduced below 7 per cent. and the lead is increased above 20; the experience of those who have made and used these alloys, is that as the tin is reduced from 8 per cent. down and the lead is increased from 15 per cent. up, the alloy becomes by degree a better bearing metal."

He had previously testified as follows:

"As far as I know myself and can learn from the testimony of those who have used these metals for bearings, the metal made with less than 7 per cent. tin and over 20 per cent. lead is, when well made, superior in antifriction quality to the Exhibit B metal which contains 8 per cent. of tin and 15 per cent. of lead; but the difference is one of gradual improvement as the tin decreases and the lead increases a better antifriction metal is obtained, without there being any break or change per saltum in the antifriction qualities of the alloy. It is a question of gradual reduction of the tin, gradual increase of the lead, giving gradually a better alloy, with probably some increased difficulty in obtaining the alloy homogeneous."

We do not think the force of this testimony is at all affected by that of Prof. Sauveur, who was called in rebuttal and presented a theory of a "critical point" in the composition of these alloys, which was first discovered and explained by the patentees of the patent in suit. A careful reading of his testimony has not thrown any new light upon the question here under consideration. To give the scientific or metallurgical reasons why 7 per cent. or less of tin permits the use of 20 per cent. or more of lead, in an alloy of copper, tin, and lead, has no bearing upon the mode in which the usefulness of those proportions was ascertained. The empiricism by which the praticability and usefulness of an alloy so constituted is determined, is the foundation for the scientific explanation given by this scientific witness, as well as by the specification of the patent in suit. It is a theory after the fact and explanatory of the fact. There is no evidence to show that there

is an absolute and sudden change at this precise so-called "critical point" of 7 per cent. of tin and more than 20 per cent. of lead. On the contrary, the weight of the testimony is all to the effect that the change in conditions is gradual in approaching this point. In other words, there is a gradual bettering of the result as the decrease from the 8 per cent. of tin in Dr. Dudley's experiment proceeds to the 7 per cent. of the patent in suit. There is no "critical point," on one side of which there is an absolutely bad product and on the other side an absolutely good product. Dr. Dudley might as well have called his 8 per cent. of tin a "critical point" and claimed a monopoly of the whole field below that figure. In the words of Dr. Richards, already quoted:

"The difference is one of gradual improvement; as the tin decreases and the lead increases, a better antifriction metal is obtained, without there being any break or change per saltum in the antifriction qualities of the alloy."

It is interesting to note that Dr. Sauveur himself testifies that this so-called "critical point" in copper-tin alloys was known at least three years prior to the application for the patent in suit. He refers to a publication of the proceedings of the Institution of Mechanical Engineers (in England), of 1897, in which is shown a diagram which indicates the existence of a "critical point" corresponding to nine per cent. of tin. This means, of course, 9 per cent. simply of the alloy of copper and tin, which is equivalent to 7 per cent. of the whole copper-tin-lead amalgam, and he adds that this constitution of copper-tin alloys has been detected "by all students who have conducted the necessary experiments."

A mere difference in the proportions of the constituents of an alloy, however useful the result may be, does not entitle the originator to the monopoly of a patent, in the absence of other circumstances than those here disclosed.

Being of the opinion that, for the reasons stated, the patent in suit is invalid, it is unnecessary to consider the other grounds of defense, though we may be permitted to say, that the prior public use set up in the answer of the defendant, seems to us to have been sustained by the testimony.

The decree of the court below is therefore reversed.