PITTSBURGH IRON & STEEL FOUNDRIES CO. v. SEAMAN-SLEETH CO.

(District Court, W. D. Pennsylvania. October 13, 1916.)

No. 55.

1. PATENTS ⟪⟫157(1)—CONSTRUCTION—"ESSENTIALLY"—"SUBSTANTIALLY."

The word "essentially" is not a synonym for "substantially," and, when used in a patent claim, means something essential or indispensably necessary.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 229, 230; Dec. Dig. ⟪⟫157(1).

For other definitions, see Words and Phrases, First and Second Series, Essentially; Substantially.]

2. PATENTS ⟪⟫328—VALIDITY AND INFRINGEMENT—ALLOY OF IRON.

The Speer and Forster patent, No. 1,071,364, for an alloy of iron in which chromium, nickel, silicon, and carbon, in small, but varying, proportions, are essential ingredients, is void for anticipation and lack of novelty; also held not infringed if conceded validity.

3. WORDS AND PHRASES—"ALLOY."

An "alloy" is a mixture or combination of metals while in state of fusion.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Alloy.]

4. WORDS AND PHRASES—"ESSENTIAL."

"Essential" means indispensably necessary; important in the highest degree; requisite.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Essential.]

5. WORDS AND PHRASES—"ESSENCE."

The word "essence" means that without which a thing cannot be itself.

[Ed. Note.—For other definitions, see Words and Phrases, Essence.]

6. WORDS AND PHRASES—"CONTROL OF CARBON."

What is ordinarily meant by the "control of carbon" appears to be such a chemical action upon the carbon in an alloy as will keep it largely in a combined graphitic state.

In Equity. Suit by the Pittsburgh Iron & Steel Foundries Company against the Seaman-Sleeth Company. On final hearing. Decree for defendant.

F. W. Winter and F. N. Barber, both of Pittsburgh, Pa., for plaintiff.

C. M. Clarke, of Pittsburgh, Pa., for defendant.

ORR, District Judge. This is a patent case. The plaintiff and the defendant are both corporations of the state of Pennsylvania, have their principal offices and foundries in this district, and are competitors with respect to their respective products of various kinds, but especially with respect to rolls which are used in forming and finishing rails, beams, and other forms of steel, and perhaps of other metals.

The patent in suit is United States patent No. 1,071,364, issued August 26, 1913, to James Ramsey Speer and William L. Forster, assignors of the plaintiff, for "alloy of iron." The plaintiff charges the

---

⟪⟫For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

defendant with infringing its rights under said patent by the use of the alloy therein disclosed.

The defenses are that the patent is invalid and void, because the alloy of iron covered by the patent had been in public use and on sale in the United States for more than two years prior to the application of the patent, because the same had been patented and described in printed publications prior to the same period, and because the subject-matter of the letters patent does not involve invention; and further it is insisted that there is no infringement on the part of the defendant.

[3] As an alloy is a mixture or combination of metals while they are in the state of fusion, it was to be expected that many analyses would be the subject of consideration in the disposition of this case. The patent in suit itself contains five separate analyses. The analyses offered by the plaintiff as tending to show infringement are reasonably few in number, but the analyses offered on the part of the defendant as tending to show the state of the prior art are very numerous.

Of the two claims of the patent in suit, one only is in issue which reads as follows:

1. "As a new article of manufacture, an alloy comprising essentially silicon, .10% to 2.00%; chromium, .5% to 1.50%; nickel, .25% to 1.00%; sulphur, not exceeding .05%; phosphorus, not exceeding .12%; manganese, not exceeding .45%; total carbon, 1.25% to 3.50%; and iron approximately sufficient to complete the 100%."

[1, 4, 5] We notice in the claim, after the word "alloy," the words "comprising essentially." The use of those words in their ordinary meaning tends to convey the idea that any alloy which did not contain the several metals named in the claim and within the limits of the percentages therein stated would not be the alloy of the patent. "Essentially" means the "state or quality of being essential." "Essential" means "indispensably necessary; important in the highest degree; requisite." The word "essence," from which both said words are derived, means "that without which a thing cannot be itself." The word "essentially" is not a synonym for "substantially." The use of both words by the patentees is found in the second claim of the patent, which is not in litigation, and cannot there be deemed, even by the patentees, to have been intended as synonymous.

[2] It appears in the claim that there are seven separate metals which are to be expected in the alloy in addition to iron. The percentages of the metals, when compared with iron, are very small, but as between themselves they have quite a large range. With respect to three of the metals, to wit, sulphur, phosphorus, and manganese, the minimum amount is not disclosed, while the respective maximum percentages are sulphur .05, phosphorus .12, and manganese .45. Because, therefore, with respect to these three metals, the minimum is not expressed, it is reasonably concluded that their relation to the other metals was not deemed important, except that they should not exceed the respective percentages disclosed as the maximum limits. Nowhere in the specifications or in the evidence on the part of the plaintiff is emphasis placed upon the value of either of those three named elements. In the original first claim filed with the application for the patent in suit there is the statement that "manganese, sulphur and phosphorus are held uni-

formly low approaching the standard for steel, in order to reduce their undesirable effects." Mr. Speer, on the witness stand, referring to the same three elements, said:

"They exist in our product, as they do in other products of iron and steel, especially steel," and that "our effort was to keep them as uniformly low as was reasonably consistent with good manufacturing practice."

It is therefore reasonable to conclude that they were made parts of the alloy of the patent merely because they were found in all steels to a greater or less extent, and for that reason only were elements *essential* to the production of the metal which the patentees believed to be new.

Excluding, therefore, the said three metals, and as well also iron, which is necessarily the main constituent of the alloy, we have left four other metals which are essential, in accordance with the instructions of the patent, to give to the alloy the characteristics which the patentees claim it possesses. Because the words "nickel" and "chromium" and the words "silicon" and "carbon" occur in the specification, respectively, in apparent association, we have given a relative proximity to such terms in the following rearrangement of the five several analyses set forth in the patent, all of which come within the ranges of percentages found in the claim in suit:

| | | | | | | |
|---|---|---|---|---|---|---|
| (a) Chromium | 1.05 | Silicon | .60 | Sulphur | | .03 |
| | | | | Phosphorus | | .043 |
| Nickel | .50 | Carbon | 2.13 | Manganese | | .30 |
| (b) Chromium | .85 | Silicon | 1.55 | Sulphur | | .023 |
| | | | | Phosphorus | | .096 |
| Nickel | .43 | Carbon | 2.93 | Manganese | | .45 |
| (c) Chromium | .85 | Silicon | 1.70 | Sulphur | | .023 |
| | | | | Phosphorus | | .096 |
| Nickel | .43 | Carbon | 3.20 | Manganese | | .45 |
| (d) Chromium | .90 | Silicon | .70 | Sulphur | | .033 |
| | | | | Phosphorus | | .040 |
| Nickel | .50 | Carbon | 1.88 | Manganese | | .250 |
| (e) Chromium | .90 | Silicon | .60 | Sulphur | | .033 |
| | | | | Phosphorus | | .073 |
| Nickel | .53 | Carbon | 2.26 | Manganese | | .22 |

The general statement is made in the specification in reference to castings containing the elements and percentages specified in claim 1 that:

"Such castings show remarkable results in tensile and transverse strength, and in wearing and abrasive qualities, and in resistance to the action of heat."

With respect to the product from the uses of the analysis above marked "(a)," this statement is made:

"The result was a very hard resistant material, requiring the lowest lathe speed and the highest grade of tool steel to dress it."

With respect to the product arrived at from the uses of the analyses above marked "(b)" and "(c)," this statement is made:

"The results obtained in these cases were materials which were hard and resistant to the action of abrasion under heat, and susceptible of being forged."

With respect to the alloy arrived at from the analyses above marked "(d)" and "(e)," it is stated:

"It can be forged into a lathe tool or drill and properly annealed and hardened. The performance of these tools is the equal of the highest grade of crucible tool steel." "The tensile strength of the first sample showed 91,220 pounds per square inch without any change in area, elongation, or elastic limit other than would be observed in cast iron."

The differences between the products of the analyses "(d)" and "(e)" are not stated in the patent. It will be noticed that the differences between those two analyses are merely that the nickel is .50, silicon .70, and carbon 1.88 in "(d)," and nickel .53, silicon .60, and carbon 2.26 in "(e)." If there is a difference between the products respectively obtained by the use of "(d)" and "(e)," what is that difference, and why does it exist? The same may be observed with respect to analyses "(b)" and "(c)." The only differences are silicon 1.55 and carbon 2.93 in "(b)," and silicon 1.70 and carbon 3.20 in "(c)." That the patent contemplates differences in the products from the use of different analyses is plain, else why are definite analyses and products mentioned, and why is claim 2 limited to definite percentages? Yet there is nothing in the patent to show why, when the percentages of one metal is increased, others are not ratably increased also. The specification says:

"We have found that in casting various sections the amount of silicon and carbon must be varied in accordance with general foundry practice to get the desired results; and it is for that reason that the maximum and minimum limits which we have given for silicon and total carbon are quite far apart. In fact, we would not limit ourselves to the amount of silicon and carbon mentioned herein, in case the castings to be made should have a very enormous section."

Again, the specification contains these words:

"It has been claimed that iron castings containing nickel and chromium with a high total carbon content are of value. From our experience we do not attach any importance to the increased carbon contained in such castings, made with the combination of alloys similar to ours; at least, no such results can be obtained in tensile and transverse strengths as we have obtained in our alloy, where the control of the carbon is not complete in connection with the control of the silicon, depending upon the size and sections of the casting. It has also been claimed that manganese over .25% in steel metal mixtures containing nickel and chromium is most harmful, where hardness and toughness are the special qualities required. From our experience we do not attach any importance to this claim for low manganese in a higher carbon alloy such as ours. Our best results are obtained, as previously stated, by a complete control of the carbon and silicon; the manganese varying in usual limits without any serious effect."

From the patent alone it might be inferred that what the patentees meant by the control of the carbon and silicon was the ordinary control well known by steel makers, whereby carbon and silicon are worked out of the charge in the furnace as indicated by the following language from the specification:

"If, however, our materials in the raw material charge do not run in analyses as figured, it may be necessary for us to hold a charge in the furnace a sufficient length of time to eliminate elements, as silicon and carbon, which run higher than we have figured them."

Mr. Speer, however, testified to a control of carbon by chromium. He states that the plaintiff depends for the hard surface on the chromium in combination with carbon, and refers to the equilibrium of the chromium and carbon in the plaintiff's product. There appears to be no such suggestion in the patent. In other words, there does not appear to be satisfactory information in the patent with respect to the relations of silicon and carbon with each other, or with the metals nickel and chromium. Nor does there appear to be any disclosure in the patent with respect to the relation between nickel and chromium, or why they should be varied in any way to secure products of different degrees of hardness or toughness, which should be respectively imparted to the iron or steel in which they are alloyed. While the court has grave doubts about the sufficiency of the disclosure of the patent in suit, it is not deemed necessary to determine that question, because the court must hold, from all the evidence, that there was no invention or discovery by the patentees.

It is admitted by the plaintiffs, as well as disclosed by a mass of evidence introduced by the defendant, that every one of the metals which together form the plaintiff's alloy were used together in the prior art in varying percentages. It was proven that many of the alloys thus found in the prior art contained the different metals within the range of percentages required to meet claim 1 of the patent in suit. Many more of the prior art alloys contained many of the metals within some of the percentages in said claim, while some of the metals were beyond the range fixed by the claim. That chromium added to an alloy of iron tended to increase the hardness, that nickel added to an alloy of iron tended to produce a toughness, that both together secured the best results when the chromium exceeded the nickel in about the same relation as disclosed by the patent in suit, were not only believed, but well known to those skilled in the art prior to the time Speer and Forster claimed invention, which was about the close of the year 1911.

[6] The control of the carbon was well known and practiced long prior to the time of their alleged invention. What is ordinarily meant by the control of carbon appears to be such a chemical action upon the carbon in an alloy as will keep it largely in a combined graphitic state. The increase of the combined carbon is obtained, not only from its association in the metal during fusion, but from the treatment of the alloy at the time of casting or by a subsequent heat treatment.

It appears in the evidence that prior to 1911 the defendants, adopting the views of many others, confirmed by the results of their own experiments, decided that sulphur could be used with advantage at a higher limit of percentage than many persons skilled in the art had prior to that time believed, and that the increased percentage of sulphur tended to give a hardness to the metal in which it was alloyed and to increase the combined carbon. The defendant, therefore,

found it advantageous to use that which the patentees deemed to be injurious above a certain limit, and which they stated to be an essential element of their alloy because it could not be avoided. The introduction of increased sulphur in the defendant's roll prior to the time of the alleged discovery by the patentees was deliberate, because they found that it seemed to unite with iron in such a way that a peculiarly dense and effective surface was provided on metals which were to be used for abrasive or rolling purposes. This mechanically fine surface appears to be an advantage to the defendant in addition to the increase of hardness which is secured. If the defendant, notwithstanding its use of sulphur in its alloy beyond the limits of the claim of the patent, may nevertheless be held to be an infringer of such claim, why may not early analyses, which vary from the limits fixed by the claim in issue in a similarly slight degree, be deemed anticipations of such claim?

In the year 1910 the Pennsylvania Steel Company began to make and to advertise extensively by means of pamphlets what is designated by them as "Mayari steel." This steel is made from iron ore found in the island of Cuba. This ore contains the valuable alloying elements, nickel and chromium. The steel made therefrom by that company contained, not only such said elements, but others used in the alloy of the patent. It was natural that the manufacturers of the country would experiment with such steel. The defendant, early in 1911, began to use it. The plaintiff at some later date acquired some. Other corporations did likewise. Where the percentages of the metals composing the alloy known as Mayari were found to be too large, other steels were used with it which did not contain such particular metals which were not desired in an excessive quantity, and results were obtained which seemed clearly to have anticipated the alloy of the patent in suit. Some of these alloys contained all the metals of the alloy of the patent and within all the ranges of claim 1 except with respect to one or perhaps two of the percentages named in such claim. In February, 1911, certain steel was made by the Pennsylvania Steel Company for the Carpenter Steel Company. The analysis of that steel was:

| | |
|---|---|
| Color carbon | 1.27 |
| Carbon by combustion | 1.22 |
| Silicon | .09 |
| Phosphorus | .007 |
| Sulphur | .034 |
| Manganese | .40 |
| Copper | .19 |
| Chromium | .60 |
| Nickel | .45 |

It will be observed that there is copper mentioned in that analysis, which is not mentioned in claim 1 of the patent; but in the specification of the patent there is an allowance of metals in addition to those specified in the claim, as appears from the following language:

"With or without small quantities of copper, tungsten and other rare metals which do not materially affect the character of the alloy as hereinafter described."

Therefore, excluding further consideration of the copper in said analysis, we find a slight variation of .01 of 1 per cent. less silicon than specified in claim 1 and very slightly less carbon than is required therein. This is an illustration of how precarious the situation of the plaintiff has become by insisting that said alloy was not an anticipation of the patent in suit, and that the product of the defendant, which had sulphur in a more marked variation from the limit disclosed in the claim, infringed.

As an example of a prior patent giving an analysis for the making of steel, United States patent No. 735,365, issued to Robert Abbot Hadfield on August 4, 1903, may be referred to. That patent discloses the use of all the metals forming the alloy of the patent in suit, giving variations within the range of which may be a combination which is within the range of the percentages of claim 1 of the patent in suit.

From the prior publications offered in evidence one only is selected, and that is what is termed in the evidence "the Borchers article." That article is mainly a description of a furnace, which is a furnace preferred by the patentees, according to their specification, for the making of their alloy. It was published in January of 1910. Not only does the writer describe the furnace, but he gives a number of analyses of products which were obtained by its use. His seventeenth analysis is an alloy which he designates as having the property of tool steel. The percentages are as follows:

```
Total carbon.............................................1.251
Manganese ...............................................  .258
Silicon  .................................................  .176
Chromium  ...............................................1.21
Nickel  ..................................................  .49
Phosphorus ..............................................  .008
Sulphur  .................................................  .01
```

The foregoing is in all respects within claim 1.

It is unnecessary to go further into the consideration of the patent in suit. As we have seen, it is met in the prior art by manufacturers, by patents, and by publications. It is therefore void.

There is, moreover, another reason why the patent should be declared void. If the alloy of the patent be all that plaintiff claims it to be, yet it differs from previous alloys only in degree. It is the result of continued experimentation by the patentees, and by their predecessors, and by some of their contemporaries, with all of the elements of the alloy in various relationships and proportions. The plaintiff, according to the testimony of Mr. Speer, is still experimenting with them. That it may use proportions as the result of the patentee's experiments different from those used by others does not entitle it to the protection of a patent. Brady Brass Co. v. Ajax Metal Co. (C. C. A. 3d Cir.) 160 Fed. 84, 87 C. C. A. 240.

Had this court been able to sustain the patent, still the conclusion would have to be reached that the defendant does not infringe. We have already indicated the reason for this to be the use by the defendant of sulphur in marked excess of the percentage required by the claim in suit. The defendant realizes that there is a value in the use of sulphur, while the patentees deemed it of no value, but rather

harmful. It is unnecessary to refer in detail to the analyses of the rolls made and sold by the defendant.

In every aspect of the case the court is obliged to find against the plaintiff, and therefore directs that a decree may be presented dismissing the bill at the plaintiff's cost.