**DAVID BELAIS, Inc., v. GOLDSMITH BROS. SMELTING & REFINING CO.**

(District Court, S. D. New York. June 8, 1925.)

1. **Patents ☞253—Mere slight improvement in composition of white gold alloy would not negative infringement.**

Mere slight improvement in composition of white gold alloy would not of itself negative infringement.

2. **Patents ☞35—Advertising and building up business is not conclusive of product's patentability, nor is popularity a safe criterion.**

Advertising extensively and building up a large business in alleged patented product of itself is not conclusive of its patentability, nor is popularity of article a safe criterion.

3. **Patents ☞328—1,330,231, claim 3, for white gold alloy, held invalid for want of invention.**

The Belais patent, No. 1,330,231, claim 3, for white gold alloy composed of gold, nickel, and zinc in proportions within given ranges, *held* invalid for want of invention.

In Equity. Suit to restrain infringement of patent by David Belais, Inc., against the Goldsmith Bros. Smelting & Refining Company. Decree for defendant.

Kenyon & Kenyon, of New York City (Alan D. Kenyon and Douglas H. Kenyon, both of New York City, of counsel), for plaintiff.

Gifford, Bull & Scull, of New York City (George F. Scull and Newton A. Burgess, both of New York City, of counsel), for defendant.

WINSLOW, District Judge. This action is brought to restrain the infringement of a patent, No. 1,330,231, of date February 10, 1920, application filed October 5, 1918, granted to David Belais, for a white gold alloy. The only claim involved in the suit is claim No. 3 of the patent, which reads as follows:

"As a composition of metal, a white gold alloy composed of gold, nickel and zinc, the proportion of the gold ranging from 75 to 85 per cent., the nickel from 10 to 18 per cent., and the zinc from 2 to 9 per cent."

The object of the invention is to produce a white gold alloy which will be a substitute for platinum in the jewelry trade. Specifically set forth in the patent, the object is defined as follows:

"My invention relates to the production of a substitute for platinum. The object of my invention is to produce a composition of matter known as white gold, that will have the appearance of platinum, and that may be used as a substitute for it, especially in the jewelry trade."

It is contended by the plaintiff that, in order to attain the objects sought for, three things are essential: (1) The original appearance must resemble that of platinum so closely that it can be used with platinum, or as a substitute for it. (2) This appearance of color must be retained, or, in other words, the alloy must not be tarnishable when used in articles of jewelry. (3) The gold alloy must be workable; i. e., capable of being made by the jewelers of the trade into articles of jewelry.

Plaintiff contends that every one of these characteristics is essential, and that no alloy not containing all of them can come under the patent invention, and that the Belais "white gold" is limited to 18 karat gold, or higher karat, as even gold, nickel, and zinc alone cannot be made into 14 karat or any-

thing less than 14 karat, without losing one or more of the three characteristics.

The defendants contend that the patent in suit is invalid, because anticipated, and is void for want of invention, and, in any event, that there is no infringement on the part of the defendant. The specific proof of infringement claimed by the plaintiff is the purchase on May 18, 1921, from the defendant of a white gold plate, the analysis of which is as follows:

Gold ...............................  80.46
Nickel ............................  14.02
Iron ..............................   .08
Zinc ..............................  4.70
Copper ............................   .74
Cobalt ............................  Trace

Plaintiff contends that the iron and cobalt are accidental, and are impurities in the nickel, and that the copper (.74) is so small in quantity as to have no appreciable effect on the article. The record discloses, however, that after May, 1921, plaintiff itself added a small amount (2 per cent.) of copper and manganese, about 1 per cent. of each.

[1] If the patent is valid, the product of the defendant, containing copper, presumably is an infringement, unless the addition of the copper has materially changed the composition. Mere slight improvement in the composition would not of itself negative infringement. American Stainless Steel Co. v. Ludlam Steel Co. (C. C. A.) 290 F. 103. For a long time prior to 1918, so-called 14 karat white gold was used to some extent for ornamentation of other kinds of gold, and to some extent continues to the present time. But practically all of the witnesses agree that there was no appreciable demand for higher karats than 14 karat gold before 1918. Eighteen karat yellow gold had been the standard gold for higher grade jewelry for generations. Platinum was introduced as a jewelry metal about the year 1890, but it was soft, and its color was so near that of silver that it took some time for platinum to displace yellow gold to any great extent. In 1910, by the addition of iridium, platinum was made harder, and it became a recognized and desirable metal for jewelry, particularly for the setting of diamonds. By reason of its higher cost, it appealed to the jewelry wearing public. Fourteen karat white gold was really a cheaper imitation of platinum.

In February, 1918, this country then being at war, the government commandeered platinum for war purposes, leaving in the hands of the jewelers only finished pieces and a relatively small amount of workable platinum. The supply of platinum for the time being was cut off. It is quite apparent from the record that the cutting off of the supply of platinum stimulated the demand for 18 karat white gold. It is in evidence that various alloys making up the so-called 18 karat white gold were sold prior to the filing of plaintiff's application. A meeting of representative manufacturers of platinum jewelry and retail jewelers was held in May, 1918, to consider steps to prevent unscrupulous dealers from foisting platinum imitations on the public, lest it destroy the legitimate demand for platinum jewelry, particularly in view of the commandeering of platinum by the government.

[2] The plaintiff has advertised extensively, and has built up a large business in its product, which has gone into quite general use. This, of itself, of course, is not conclusive of its patentability, nor is the popularity of the article always a safe criterion. McClain v. Ortmayer, 141 U. S. 419, 428, 12 S. Ct. 76, 35 L. Ed. 800.

[3] The claim of the patent under consideration, by its terms, limits it to three metals only. The witness Belais himself says that the novel product described meant "those three metals only." Plaintiff's expert testified that the addition of a fourth metal to a ternary alloy makes it impossible to forecast the characteristics of the new alloy, particularly when such added fourth metal affects the characteristics of the mixture. It seems to me that the claim No. 3 is somewhat vague and nebulous, because of the wide ranges given to the three metals. Indeed, plaintiff's main witness testified that any of the compositions possible within these three ranges is workable. But, under cross-examination, he stated that at least one "possible combination," consisting of 75 per cent. gold, 18 per cent. nickel, and 7 per cent. zinc, would not be a "homogeneous metal"; i. e., not useful. If this be true, the claim is somewhat broader than the invention. Matheson v. Campbell, 78 F. 923, 24 C. C. A. 384.

If the plaintiff is justified in expanding his claim to include other metals—for illustration, an alloy having 75 per cent. of gold, 10 per cent. of nickel, and 2 per cent. of zinc, leaving 13 per cent. to be filled by some other metal—then plaintiff's claim, if sustained, would dominate any alloy having the above-mentioned percentages of these metals, regardless of what else may make up this additional 13 per cent. This inquiry is pertinent, for the reason that one of plaintiff's witnesses has testified that even the addition of trifling amounts of certain metals

to gold makes very marked and wonderful changes. We must assume, however, that claim 3 is limited to gold, nickel, and zinc only, and that any alloy having a fourth metal, if such fourth metal materially affects (not merely improves) the quality of the mixture, is entirely outside the patent.

The defense of anticipation is largely predicated upon the use of what is known as Haffner gold and Sheff gold, although other white gold alloys are in evidence. At the outset, there can be no question that the burden is on the defendant to prove the facts beyond a reasonable doubt as to prior knowledge or prior use.

The so-called Haffner white gold was brought to this country in 1913 from Germany, and used here, proof of which is covered, not only by oral testimony, but by letters and bills, and an analysis made at the time of its importation. A portion of the specimen remained in the possession of one of the witnesses until after the beginning of this litigation, when it was assayed and checked with the first assay. The record satisfies me that at least one complete setting was made from this specimen in this country. The 1913 analysis and the 1923 analysis of this specimen vary only slightly; the proportions of gold and zinc and the nickel being within the ranges of claim 3 of the patent under discussion, and the nickel approximating somewhere between 1 per cent. and 1.1 per cent. over the range of the claim. The two analyses are as follows:

|        | 1913. | 1923. |
|--------|-------|-------|
| Gold   | 75.39 | 75.87 |
| Nickel | 18.75 | 19.10 |
| Zinc   | 5.84  | 4.99  |

Regarding the so-called Sheff gold, the testimony is that a brooch was made of this particular specimen in the spring of 1918; the witness testifying that he made it and gave it to his wife as an anniversary present. The analysis of a portion of this brooch shows that it contained gold 75.14, copper .69, zinc 5.55, and nickel 18.60. There is other corroborating evidence tending to prove knowledge and use. I am convinced that the Sheff testimony is true. In each of these two instances (Haffner and Sheff) the nickel is slightly greater than the maximum limit set by Belais in claim 3.

It may be contended that, because the nickel is in excess of the range of the claim, these products had no utility and were merely abandoned experiments. If, however, they were in fact anticipations, their abandonment would have been to the public. It is in-

teresting, however, in this connection, to consider the trend of the art. It was well known to metallurgists that the addition of a relatively small proportion of nickel to gold has a marked effect on the color as to whiteness, but that it makes the gold hard, and therefore more difficult to work. An appreciable percentage of zinc above a maximum decreases the ductility of gold, and makes it more brittle. It is also admitted that the addition of a small amount of copper makes the alloy more ductile, but gives a marked brownish or reddish tinge, so that workers with such an alloy were met with two antagonistic results: A decrease in the copper, while making the alloy more workable, detracted from the white appearance; and increase in the nickel at the expense of the copper, improved the appearance, but rendered the alloy less workable. In regard to zinc, Braunt, a recognized authority, says in his work (1896):

"A small content of zinc has a beneficial effect upon the ductility of many gold-copper and silver-copper alloys, especially when they contain much copper. According to Peligot, gold-copper alloys, with 58 to 60 per cent. gold, for instance, which by themselves are quite difficult to work, become more ductile by replacing 5 to 7 per cent. of copper with the same quantity of zinc; thus, 58 to 60 per cent. gold, 35 to 37 per cent. copper, 5 to 7 per cent. zinc. However, if the content of zinc exceeds this limit, the ductility decreases."

All of these things were known to workers in the art. If the patent is valid, and be construed strictly, so as to find that the Haffner and Sheff golds were not anticipations, then it follows that such strict construction would determine that the composition of the defendant, which contains a small percentage of copper, is not an infringement. In other words, if the 1 per cent. difference in amount of one of the metals of the patent combination is sufficient to show no anticipation, then it follows that, if infringement is now sustained, it is necessary to come to a contradictory conclusion in the instant case that the addition of approximately 1 per cent. of the copper is still within the claim.

As to the question of workability, the term would seem to be a relative one. Standards of workability have changed, and continue to change. It is testified by one of plaintiff's witnesses that the patented composition in suit cannot be drawn into seamless tubing, which would be a limitation upon its workability. In like manner, if the alleged anticipations are less ductile and less workable

than the Belais composition, it merely follows that the difference is in degree. To put it another way, it does not appear from the record before me that there is any critical point as to workability in the composition of these various alloys. There is no evidence to show that there is an absolute and sudden change discovered by Belais, which indicates a critical point. The claim itself is within wide ranges, and merely indicates—what has been known to skilled workers in the art— that the addition of one of the base metals, at the expense of another, either adds to or detracts from ductility or color, as the case may be. It might be a matter of opinion as to workers in the art, or the purchasers of the manufactured product, as to the desirability of the various ternary alloys. A mere difference in the proportions of the constituents of an alloy, however useful the result may be, does not, of itself, to my mind, entitle the patentee to a monopoly of the patented product. Mr. Belais himself has testified that it was barely possible that he had sold some of his white gold containing as high as 18.45 per cent. nickel. It is interesting, also, to note that the Belais formula of the product now sold contains a small percentage of copper and manganese.

Assuming, for the moment, if the Haffner and Sheff golds, by reason of the fact that they have a percentage of nickel greater than the claim under consideration, and thereby are taken outside of the patented product— for it is a product, and not a process—they certainly are evidence of the prior art by which we may measure the change which Belais claims to have made.

In addition to Haffner and Sheff, evidence was produced to show that Baker, Herpers, and Handy & Harmon, prior to the patent herein, made gold alloys, consisting of gold, nickel, and zinc, within the range, and containing 5 per cent. copper. The Sheff gold, it will be noted, contained less than 5 per cent. copper.

The standard treatises show the relative effects of the baser metals when alloyed with gold, and set forth their effect as to ductility and color. Skilled workers in the art knew, long prior to 1918, the effect of varying the proportions of the several base metals in white gold alloys.

In arriving at a determination as to the validity of the patent, the crucial test, to my mind, is whether or not, with the knowledge of the prior art in mind, Belais has effected a sudden change, to which the expression "critical point" has been applied, in the combination brought by the addition of a given quantity of another one of the baser metals. While the degree of change is not exactly proportional to the quantity of the metal present, the evidence is to the effect that the rate of change as to color is more uniform than the change in ductility. But, with this knowledge of the prior art, Belais took the 18 karat white gold alloy, containing percentages of copper from 5 to 10 per cent., and reduced the copper to zero and correspondingly raised the nickel, thus obtaining a mixture whiter, but correspondingly harder, than the prior art of Baker and Herpers.

Each increase in the percentage of nickel and decrease in the percentage of copper gave a substantially proportionate change in color and ductility in accordance with the well-known laws of the art. Every change which the patentee made over the prior art was merely one of degree, and at no fixed point is there any startling change in characteristic. The substitution of a small percentage of zinc for a like amount of one of the other base metals did not detract from the color, and, within limits expressed by the text-book writer, did not detract from ductility. This was prior knowledge of the art. The lowering of copper gradually eliminates the red color, until the color disappears with the complete elimination of copper. As the nickel increases, the ductility falls. Belais seeks to place the absolute limit at 18 per cent. of the nickel; but, of course, the ductility keeps on decreasing as the 18 per cent. nickel is exceeded. As to tarnishing, there is less in the higher karat gold alloy, but again it becomes a matter of degree. The varying opinions of witnesses on this point are interesting, but not at all convincing.

I am of the opinion that the Belais formula is the result of a mere selection of proportions to give a desired character, whiteness at the expense of ductility, and that such selection is in accord with the normal development of the art in making white gold. I do not believe that the Belais formula, even if better than others which preceded it, is an invention. The development of an old idea, and changing merely the degree, certainly does not involve invention. Novelty in proportions involves something more than merely figuring out differing proportions that were well known before. A new metal must be developed, in the sense that new results come from the new proportions, and substantially better results so far as utility is concerned must be present.

In the present instance, the difference in degree as to the various products having slightly different proportions of the baser

metals brings forth differences of opinion both as to appearance and workability. There is no startling change or narrow line of demarcation between one product and another. On the one hand, there is no absolutely bad product; and, on the other hand, there is no absolutely good product. The case of Brády Brass Co. v. Ajax Metal Co., 160 F. 84, 87 C. C. A. 240, seems to me quite in point, and a quotation therefrom (page 90 [87 C. C. A. 246]) seems pertinent to the instant case: "A mere difference in the proportions of the constituents of an alloy, however useful the result may be, does not entitle the originator to the monopoly of a patent, in the absence of other circumstances than those here disclosed."

In the Brady Case, plaintiff endeavored to establish a "critical point." I do not think that Belais has first discovered a sudden change in the characteristics of the metal. There is no exact standard or means of measuring color. Some witnesses might well say that with 2 or 5 per cent. of copper there is a perceptible change in color, dependent upon the ability of the witness to determine by merely visualizing it. In the exhibits before the court, with knowledge of its inclusion, some might detect the presence of copper, and others be wholly unable to distinguish it. As to ductility and hardness, resulting from the increase or decrease of the copper, or its complete elimination, so, again, witnesses might differ as to the advantages or disadvantages of the varying degrees. Greater, skill on the part of workmen and improved tools, to some extent, overcome the difficulties in working.

As to zinc, the third metal of the claim, it was known to the art, as evidenced by the text-book writers, that there is a limit, which, if exceeded, causes the gold to separate out and the ductility ceases. But below this maximum the same considerations apply as well to zinc as to copper and nickel.

To summarize, it may be said that each manufacturer, in his experiments, sought to ascertain what proportions were best suited for his particular purposes. Quantitatively, the exact qualities may not be accurately predicted, except as to color, but, in a sense, the quality, as to color and ductility, is predictable, the varying results differing only as to degree. There are two characteristics which are antagonistic, and the manufacturer must make up his mind as to the proportions of the different mixtures, in order to ascertain the degree of each evil or undesired attribute that he will accept in his compromise; but there is no best point which represents the final choice toward which the art is working.

For the reasons stated, I am of the opinion that the patent in suit is invalid for want of invention. Settle decree for defendant on notice.