* * * as the parties are represented by competent counsel, the need of assistance cannot be assumed.

Further, it is not only true that here "consent has not been given," it is not shown that consent was ever sought, and there is affirmative opposition to the motion.

In the affidavit of the proponent of the motion it is suggested that if it were the rule to deny the appearance of *amicus curiae* "only [solely?] because the parties to the litigation had failed to consent," the result would be that "discretion as to the appearance of *amicus curiae* would rest with counsel and not with the court."

We, of course, are not here denying the court the right to exercise judicial discretion; we are simply exercising it in what seems to us to be the proper manner in light of the situation in this case.

The motion is *denied*.

EASTMAN KODAK COMPANY *v.* UNITED STATES (No. 4695)[1]

---

[1] C. A. D. 539.

United States Court of Customs and Patent Appeals, June 17, 1953

*Barnes, Richardson & Colburn* (*Lawrence, Tuttle & Harper* and *George R. Tuttle* of counsel) for appellant.

*Charles J. Wagner*, Acting Assistant Attorney General (*Joseph E. Weil* and *Richard F. Weeks*, special attorneys, of counsel), for the United States.

[Oral argument April 15, 1953, by Mr. Tuttle, Mr. Barnes, and Mr. Weil]

Before Garrett, Chief Judge, and O'CONNELL, JOHNSON, WORLEY, and JACKSON (retired), Associate Judges

JACKSON, Judge, delivered the opinion of the court:

The subject matter out of which this litigation arises is shark liver oil. The livers are obtained from sharks caught in the Gulf of Cali-

fornia. After processing the livers in Mexico so as to obtain the oil therefrom, it was imported into the United States where it was classified by the Collector of Customs as inedible drugs advanced in value pursuant to paragraph 34 of the Tariff Act of 1930. Appellant protested the classification made by the collector and claimed the importation to be drugs in a crude state under the provisions of paragraph 1669. The paragraphs read as follows:

Par. 34. Drugs, such as barks, beans, berries, buds, bulbs, bulbous roots, excrescences, fruits, flowers, dried fibers, dried insects, grains, herbs, leaves, lichens, mosses, roots, stems, vegetables, seeds (aromatic, not garden seeds), seeds of morbid growth, weeds, and all other drugs of vegetable or animal origin, any of the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for, but which are advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture, 10 per centum ad valorem: *Provided*, That the term "drug" wherever used in this Act shall include only those substances having therapeutic or medicinal properties and chiefly used for medicinal purposes: *And provided further*, That no article containing alcohol shall be classified for duty under this paragraph.

Par. 1669. Drugs such as barks, beans, berries, buds, bulbs, bulbous roots, excrescences, fruits, flowers, dried fibers, dried insects, grains, herbs, leaves, lichens, mosses, logs, roots, stems, vegetables, seeds (aromatic, not garden seeds), seeds of morbid growth, weeds, and all other drugs of vegetable or animal origin; all the foregoing which are natural and uncompounded drugs and not edible, and not specially provided for, and are in a crude state, not advanced in value or condition by shredding, grinding, chipping, crushing, or any other process or treatment whatever beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture: *Provided*, That no article containing alcohol shall be admitted free of duty under this paragraph.

It appears that the only value possessed by shark livers or shark liver oil is Vitamin A.

As properly stated in the brief of counsel for appellant, the imported merchandise and the involved tariff provisions are the same here as in the case of *Geo. S. Bush & Co., Inc.* v. *United States*, 32 C. C. P. A. (Customs) 56, C. A. D. 285, and it is said in the brief of counsel that the reason for the collector's assessment in the instant case was the holding of this court in the *Bush* case, *supra*.

Counsel point out in their brief that the appeal in the instant case presents a different point of law in that the instant importation has not been advanced in value or condition "beyond that essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture." In addition to that issue, counsel for appellant make the following alternative contention: (a) the therapeutic value and condition of the drug Vitamin A was unchanged by the extraction of the oil from the raw liver and therefore was merely separated from the unusable portion of the liver, (b) although

shark livers are a source of drug material that they are not drugs and therefore the imported oil is the crude drug.

The case was tried before the First Division of the United States Customs Court and was carried on concurrently with that in the case of *Geo. S. Bush & Co., Inc., et al.* v. *The United States*, 26 Cust. Ct. 251, C. D. 1332, and the case of *Wilbur-Ellis Company* v. *The United States*, 27 Cust. Ct. 317, Abstract 55884. Those two cases are now on appeal, being numbered 4708 and 4713 respectively.

Much of the testimony in the present case was incorporated from the testimony of witnesses in the *Bush* and *Wilbur-Ellis* appeals.

In its decision herein, C. D. 1333, the trial court stated that its decision in the *Bush* case controlled the disposition of their decision herein, stating that the issues here and in the *Bush* case were identical and the records in both substantially the same.

The trial court overruled the protests in all three mentioned cases and gave judgment accordingly. From those judgments the hereinbefore mentioned appeals were taken.

The oil in the *Bush* case was produced from the livers of dogfish, a species of shark, and that in the *Wilbur-Ellis* case was produced from shark livers in Argentina.

The processing of the shark livers from which the imported merchandise is extracted was correctly and succinctly described in the decision of the trial court as follows:

Livers are taken from sharks caught in waters of the Gulf of California, off the east and west coasts of Mexico. They are chopped into pieces and put into 5-gallon cans, that remain unsealed and to which is added a quantity of salt (approximately 1 per centum of the weight). Fishing boats, equipped to preserve the livers, under refrigeration, transport them to the processing plant, where they are sorted according to species, of which there are three, hammerhead, bolador, and barroso. Each is easily distinguishable through texture and color. Following segregation, all of them are subjected to the same process for extraction of the oil. The livers are ground to destruction in so-called "Enterprise" mill, reducing them to a fine paste that is pumped to cooking tanks where water and sodium hydroxide (lye) are added. Lye is used to "break down the proteins" and obtain a better yield of oil. After heating to 180 degrees Fahrenheit, the mixture is run through a series of centrifuges, separating the oil from the liver tissue and water. The oil thus obtained, and without adding any other substance, is shipped in 55-gallon drums that are filled "within a half inch of the top."

In its decision in the *Bush* case, *supra*, heavily relied upon, as hereinbefore mentioned, by the trial court, it was stated that dogfish livers are natural uncompounded substances containing no alcohol and are not edible although they may be eaten without deleterious results; that the livers are obtained and used because of the therapeutically valuable Vitamin A which, in the natural state, exists in the liver tissue as well as in solution; and in order to obtain the maximum amount of the vitamin content, the livers are destroyed and the therapeutic element is extracted in oil. The court then went on to

point out that the issue in the *Bush* case, as here, was whether the processing of the livers in the country of exportation was essential to prevent decay or deterioration of the drug.

The record in that case and here is to the effect that shark livers deteriorate immediately upon the death of the fish and that destructive enzymes cause a hydrolytic effect in producing oxidation and breakdown of the protein derivatives thereby developing free fatty acid with discoloration, disagreeable odor, and consequent loss of the vitamin. The court in its decision in that case stated as follows, which statement is strongly relied upon by counsel for appellant:

Refrigeration, salting, and the use of chemical substances are recognized commercial methods for preserving dogfish livers. Each varies in degree of effectiveness, but none stops deterioration. Salting was characterized as a very inferior method of preservation. Freezing does not arrest deterioration but slows it down. The effective way of preserving the medicinal value of the drug is in the form of free oil, removed from liver tissue, because the oil contains chemical compounds, called antioxidants, with properties that protect vitamin A against destruction by exposure to air.

The court in its decision then went on to say:

While the record is sufficient to say that there is deterioration in some degree with loss in potency of vitamin A, as long as the livers are in transportation and without converting the drug to the form of oil, the proof is equally clear that dogfish livers, the crudest form in which the therapeutic or medicinal properties first appear, are articles of commerce, and shipped as such from different parts of the world into the United States, and in this country they are dealt in and processed, just like the livers from which the oil under consideration was obtained, for their medicinal value, and to extract the oil with its therapeutic element, vitamin A. * * *

The court commented on a statement made by counsel for the plaintiffs in that case in their brief as follows:

As appears throughout the record, shark livers are shipped long distances to the United States, from the Philippines, Japan, Argentina, Mexico, Peru, etc. * * * and from Alaska * * * and Los Angeles * * * to Seattle.

The court remarked that such concession on the part of counsel was entirely logical in admitting the existence commercially of shark livers, the crude drugs, and stated that it was a controlling factor in the trial courts disposition of the issue then under consideration.

It was stated in the decision in the companion *Bush* case that the proof offered on behalf of plaintiffs was weak in that none of the witnesses stated that shark livers preserved by any of the commercial preservatives showed a loss of Vitamin A so substantial that the preserved livers were not usable commercially and that the extraction of the vitamin oil rendered commercially nonfeasible. The court in that respect stated as follows:

* * * The gist of plaintiffs' testimony is that none of the commercially accepted and recognized methods of preserving shark livers will completely halt deteriora-

tion and loss of vitamin A, and that none of such methods are completely effective. But this is not what the statute requires for concluding that processing is "essential" to prevent decay or deterioration pending manufacture.

The court held that plaintiff had not produced sufficient evidence that the processing of the shark livers into the form of oil was not an advancement in either value or condition from the crude liver state. It was of opinion that the record was conclusive that the crudest form in which the therapeutic or medicinal properties of the drug exist was in the livers, and that such livers are articles of commerce both in domestic and international trade and commerce of the United States, and that they are satisfactorily preserved during long periods of time and brought from distances extending from 1500 to 5000 miles without such a loss of Vitamin A as would render its extraction from the livers impracticable or infeasible. The court properly remarked that shark livers could readily have been transported instead of the oil from the livers, and we agree with its statement that for convenience and desirability exporters or shippers from their business point of view found it worth while to process the shark livers and to export the extracted oil rather than the livers.

The court in the companion *Bush* case discussed the meaning of the word "essential" in connection with the proper packing of the drugs contained in paragraph 34. It quoted the definition of the word from Webster's New International Dictionary, 1933, as

3. Important in the highest degree; indispensable to the attainment of an object; indispensably necessary.

and cited the case of *Pittsburgh Iron & Steel Foundries Co.* v. *Seaman-Sleeth Co.* (D. C. Pa.), 236 Fed. 756, 757, and the cases *City of Kalamazoo* v. *Balkema et ux.*, 233 N. W. 325, 326; 252 Mich. 308; and *City of St. Louis* v. *Dreisoerner*, 147 S. W. 998; 243 Mo. 217; 41 L. R. A. (N. S.) 177. The court held that in applying the cited definitions in connection with the involved statutory language that the processing of a crude drug to prevent "decay or deterioration pending manufacture" applies only to such treatment or manipulation which is indispensably necessary for commercially satisfactory preservation during transportation and pending manufacture and which would prevent decay or deterioration that would result in substantial loss of the therapeutic or medicinal properties which would render importation into the United States commercially impracticable.

It is true, as pointed out in the brief of counsel for appellant, that the imported merchandise is further treated before it is eventually used for medicinal purposes, that further treatment seems to be a concentrating process whereby concentrates of the vitamin may contain from five to twenty times the potency of the original oil. That is very interesting but to our way of thinking has scarcely any

weight in solving the problem before us. It does not matter, as we view it, whether the character or amount of the Vitamin A ever changes. The main question is whether or not the imported oil is in a crude form rather than in an advanced form of the drug.

It appears logical to us if the imported oil containing the vitamin is a drug then the liver which likewise contained the vitamin is also a drug. Clearly, the liver which is the drug is in a cruder condition than the oil which was extracted therefrom by the process hereinbefore described.

Shark livers are imported into the United States from great distances and are processed in the same fashion to procure the oil as was done in the instant case. Obviously, if the livers are so brought into the United States in great quantities and are so processed as to produce the oil, it is not essential that they should be reduced to oil to prevent such decay or deterioration as to render them unprofitable in those business enterprises.

We see no necessity for discussing the great number of cases that have been cited in the brief of counsel for the appellant. None of them are of such a nature as to be applicable to the facts in this case.

Counsel for appellant rely heavily on our decision in the case of *United States* v. *Judson Sheldon*, 33 C. C. P. A. (Customs) 73, C. A. D. 318, and in that connection state that if it were not for the case of *Bush* v. *United States*, 32 C. C. P. A. (Customs) 56, C. A. D. 285, that the conclusion in the *Judson Sheldon* case would show positively that this court considered the processing of the edible beef livers in the *Judson Sheldon* case to have been for no other purpose than to get it by itself and therefore not to create an advanced drug.

The *Judson Sheldon* case was utterly different than the case at bar. There the original carrier was edible beef liver, consequently it was removed entirely from paragraph 34, which, it may be noted, applies to natural and uncompounded drugs which are not edible. We see no reason to further discuss the *Judson Sheldon* case.

We may summarize by stating that the shark livers from which the involved oil was taken in this case are clearly of animal origin, which are "natural and uncompounded drugs and not edible, and not specially provided for" and that they have been advanced in value and condition by grinding and crushing in a manner entirely beyond that "essential to the proper packing of the drugs and the prevention of decay or deterioration pending manufacture, * * *."

For the reasons hereinbefore set out, the judgment of the United States Customs Court is *affirmed*.

COLE, J., having disqualified himself, Jackson, J., retired, was recalled to participate herein.